Argued March 2, reversed and remanded April 6, petition for rehearing denied May 11, 1955

# STATE HIGHWAY COMMISSION *v.* SUPERBILT MANUFACTURING CO., INC.

281 P. 2d 707

*Charles Peterson,* of Portland, argued the cause for appellant.

*S. J. Bishoff* and *George W. Mead,* of Portland, argued the cause and filed a brief for respondent.

Before Warner, Chief Justice, and Tooze, Rossman, Lusk, Brand and Latourette, Justices.

TOOZE, J.

This is a condemnation action brought by the state of Oregon, by and through its Highway Commission, as plaintiff, against Superbilt Manufacturing Co., Inc., an Oregon corporation, and others, as defendants, to condemn certain real property for right of way purposes in the construction of a new state highway known as "The Banfield Expressway". Upon the trial the sole factual question at issue was the sum of money to be paid defendant Superbilt Manufacturing Co., Inc. (hereafter referred to as Superbilt), as just compensation for the taking. Based upon the jury's verdict, judgment was entered in favor of defendant against plaintiff in the sum of $385,000, with interest thereon at the rate of 6 per cent per annum from the date of judgment until paid, together with the further sum of $30,000 as a reasonable attorney's fee.

On this appeal we are concerned only with the respective claims of plaintiff and the defendant Superbilt.

The land involved is located on the north side of N. E. Holladay street, between N.E. 25th and N.E. 26th avenues, in Portland, Oregon. The land lies with 200 feet fronting on N. E. Holladay street, and is slightly over 100 feet deep to the railroad right of way of the O.W.R. & N. RR. Company. The tract comprises approximately .52 of an acre and is hillside property.

The land is improved with a building of brick, masonry and frame construction, the west one-half of which was built originally about 1907, and the east one-half of which was erected originally about 1913, both as three-story structures in which, subsequent to 1920,

two additional wood floors were inserted, thereby making it a five-floor building.

The two original parts of the building were constructed by the Blake-McFall Company as a paper warehouse. The building was later converted into a furniture and manufacturing plant, and was so used by the defendant.

The building is equipped with all machinery and apparatus necessary to the conduct of the business of manufacturing and selling furniture and mattresses, and, as so equipped, its highest and best use is that of a furniture and mattress manufacturing plant.

This action was brought pursuant to the provisions of ch 366 ORS and related sections of the highway code. No question is raised as to the regularity of the proceedings taken by the Highway Commission as a preliminary to the commencement of the action, nor as to the public necessity of the appropriation.

Article 1, § 18, Oregon constitution, provides:

"Private property shall not be taken for public use, nor the particular services of any man be demanded, without just compensation; nor except in the case of the state, without such compensation first assessed and tendered; * * *."

The statute (§ 100-116, OCLA, as amended by ch 283, Oregon Laws 1947; ORS 366.375) under which plaintiff is proceeding provides in part that the state Highway Commission may, under certain conditions which are specified, commence an action in the circuit court:

"* * * for the condemnation of such interests as such owner or owners may have in said real property, * * *, and for determining the compensation to be paid therefor, and the damages, if any there be, for the taking thereof."

Plaintiff's complaint is in the usual form, first alleging a compliance by it with all conditions requisite to its authority to maintain the action, and the public necessity of the appropriation. In paragraph III of the complaint it is alleged in particular:

"That the real property hereinafter described is necessary and required for right of way purposes and is required for the proper construction of said highway by the State, which real property is described as follows, to-wit: [Property is described by metes and bounds]."

By its amended answer defendant admitted all the allegations of plaintiff's complaint. For an affirmative answer and defense, defendant in part alleged:

"II

"That defendant Superbilt Manufacturing Co., Inc. is engaged in the business of manufacturing and sale of upholstered and other furniture, mattresses and bed springs and for that purpose, operates a complete factory upon the real property described in the complaint and its appurtenances; that it has maintained and operated said factory on said real property for a great many years prior to the commencement of this action; that the said building and its appurtenances constructed on the aforesaid real property, is especially constructed, designed, equipped and arranged for the use thereof as a manufacturing plant for the manufacture of the aforesaid merchandise and the display and sale thereof to the trade and by reason of such construction, arrangement, equipment and design and its appurtenances, the highest and best use to which the said property is adaptable and useable, is for the manufacture, display and sale of the aforesaid merchandise; that the said buildings, located on said real property, contain in excess of eighty thousand square feet of floor area; that it is of masonry and mill construction; that the location of said property and the improvements thereon is within the proximity of the metropolitan area of the

City of Portland, Oregon; that it is conveniently located with respect to the availability of employees for the operation of the plant and with respect to accessibility of retail merchants who can quickly and conveniently call at the said property to inspect and purchase the merchandise produced by the defendant; that the property adjoins the right of way of the Union Pacific Railroad and has thereon a spur railroad trackage, making the plant of the defendant accessible by transportation facilities for both raw materials and its finished products.

### "III

"To make the improvements on the said real property adaptable for the efficient operation of a plant for the aforesaid purposes, defendant has installed in said plant, fixtures, improvements and appurtenances to adapt the building for the manufacture, display and sale of furniture, mattresses and springs, as aforesaid, for use, as aforesaid, which is the highest and best use to which said property could be put; that the improvements, appurtenances and installations contained therein, including the following [sic]:

"(a) Fluorescent fixtures.

"(b) Automatic sprinkler system for fire protection.

"(c) Air conditioning system.

"(d) Steam heating system units and wall type convectors.

"(e) Fire proof room for the protection of painting materials.

"(f) Blower system for dust collection and control.

"(g) Conveyors.

"(h) Intercommunication system with necessary wiring installed.

"(i) Public address system with wiring and conduits installed.

"(j) Electric clock system with wiring and conduits installed.

"(k) Railroad trackage.

"(l) Sample rooms.

"(m) Extra heavy concrete floors and bases to carry and support heavy machinery.

"(n) Special wiring conduits and power supply system especially designed for the operation of the machinery throughout the plant.

"(o) Bins for storage of materials.

"(p) Cutting tables.

"(q) Shafting, belting motors and other installations for the transmission of power throughout the plant.

"(r) Dust collecting bags and bins, and many other installations and items of equipment for the necessary and convenient operation of the said plant.

## "IV

"That in addition to the improvements and appurtenances and installations described above, defendant has installed in said buildings and on said real property, numerous items of heavy, complicated and intricate machinery, to-wit:

"1—Cushion Filler
1—Cushion Closer
1—Hassock Press
1—Chain Hoist Lift
1—Arm Press
1—Spot Welder
1—Fan Assembly
1—Cotton Picker—Willower
1—Bostitch Wire Stitcher—150
1—Quilting Machine
4—Cotton Felting Machines
2—Mattress Fillers
1—Border Machine
1—Automatic Coiler
1—Baler
1—Cotton Tuffting [sic] Machine
1—Button Tuffter

1—Tape Edge Machine
2—Roll Edge Machines
1—Stitcher Machine
1—Air Press
1—Chair Press
1—Chair Clamp
1—Daveno Air Press
1—Spot Welder
1—Daveno Frame Air Press
6—Helical Weaving Machines
1—Ferrell Air Clamp—air
1—Multiple Boring Machine
1—Hair Picker
1—Double Head Planer
1—36″ Band Saw
2—30″ Band Saws
1—No. 1 American Table Saw
1—1¼″ Spindle Shaper
1—Dowel Driving Machine
1—Triple Drum Sander
3—Spindle Carvers
1—Belt Flat Sander
1—Tongue and Groove Machine
2—Excelsior Machines

that in order to remove the same, the said machinery must be disassembled and taken apart because it is incapable of being moved in the present condition; that the said machinery must be removed and re-installed and re-assembled by the defendant in another location; that a great deal of said machinery consists of many delicate parts and must be taken apart, moved and re-assembled by men who are especially trained in the assembly and operation of such equipment and the cost of said disassembling, removal, re-assembly and re-installation will exceed the sum of $40,000.00.

"V

"That the cost of removing and re-installation of other items of installations and equipment, machinery and property, to-wit;
"1—Electric fan
1—16″ Band Saw

1—Bostitch Fox Edge Stitcher
1—No Sag Cutter
1—Murdock Cotton Picker
1—Cotton Picker 'Willower'
14—Singer Sewing Machines
2—Drill Press
1—Ideal Wire Stitcher
2—Bostitch Stitchers
4—Sewing Machines
1—Helical Machine
1—Cushion Filler
1—Button Tufting Machine
1—Sewing Machine
1—Arm Air Press
1—15″ Drill Press—Driver
3—5 H.P. Air Compressors
4—Arm Presses—Air
1—Irvington Cut Off Saw
1—Hair Picker
1—16″ Automatic Rip Saw
1—Double End Boring Machine
1—12″ Irvington Swing Saw
1—12″ Jointer
1—Automatic Shaper
1—Wood Turning Lathe
1—Model 6—American Table Saw
1—Vougnut Brush Sander
2—Balloon Roll Sanders
1—½″ Shaper
1—Gumming Machine
1—2 Spindle Boring Machine
1—10″ Table Saw
1—Edge Sander
1—Double End—Dennis Boring Machine
1—Bench Grinder
All removable Motors

## "VI

"That the value of the real property above described, proposed to be taken by the plaintiff, together with the improvements and appurtenances situated thereon, have an actual cash market value at the time of the commencement of these proceed-

ings in the sum of $390,000.00 exclusive of the damages referred to above, with interest thereon at the rate of 6% per annum from the taking thereof."

■ Plaintiff moved to strike many portions of the new matter alleged in the amended answer. Its motion was directed in particular to paragraphs IV and V. It is unnecessary for us to discuss the lengthy motion in detail. As will later develop, the motion should have been sustained in most respects. The issues now before this court upon the appeal are largely the same issues presented to the court below upon the motion. The circuit judge who heard the motion denied it in all particulars, but that judge did not try the case. However, at the outset of the trial the able trial judge took the position that the law of the case had been established by the prior ruling upon the motion to strike and conducted the trial accordingly. In Multnomah county, where there are several trial judges, the presiding judge customarily hears and decides all preliminary motions and demurrers, while the trial is held before another circuit judge. This often presents a rather delicate situation to the trial judge, where his opinion as to the applicable law may differ from that of the presiding judge. However, responsibility for the conduct of the trial according to the applicable law and rules of evidence is solely that of the trial judge, and though a prior ruling upon the law by the presiding judge may be and most often is persuasive, nevertheless, it is in no sense binding upon the trial court. It must be kept in mind that if error is committed upon the trial, that error is chargeable to the trial judge, and not to the presiding judge.

Upon the denial of its motion to strike, plaintiff filed its reply denying the new matter of the amended answer, and, in particular, denying that the sum of

$390,000, or any other sum in excess of $100,000, was just compensation for the property being appropriated.

Before giving attention to the principal issues involved on this appeal, we will dispose of one or two of the more or less minor issues.

■ The trial court permitted the defendant to open and close the case. Plaintiff contends this was error.

As to condemnation proceedings, ORS 366.375 (3) provides:

"Except as otherwise provided in ORS 366.375 to 366.390, such action or proceedings shall be commenced and prosecuted to final determination in the same manner as an action at law."

ORS 41.210 provides:

"The party having the affirmative of the issue shall produce the evidence to prove it. Therefore, the burden of proof lies on the party who would be defeated if no evidence were given on either side."

ORS 17.210, so far as material here, provides:

"When the jury has been selected and sworn, the trial, *unless the court for good and sufficient* reason otherwise directs, shall proceed in the following order:

"(1) The plaintiff shall concisely state his cause of action and the issues to be tried; the defendant then in like manner shall state his defense or counterclaim or both.

"* * * * *

"(5) When the evidence is concluded, unless the case is submitted by other [sic] sides to the jury without argument, the plaintiff shall commence and conclude the argument to the jury." (Italics ours.)

The order of trial provided for in ORS 17.210 shall be followed in all trials to a jury *unless* for good and

sufficient reason the trial court directs otherwise. The effect of this proviso is to vest in the trial court some discretion in the matter. Where, as in the instant case, the only factual question at issue is the sum to be paid defendant as just compensation, and the burden of proof rests upon the defendant to establish an amount in excess of that offered by the plaintiff, the trial court may properly exercise its discretion by permitting the defendant to open and close the case. Its action in that respect will not be disturbed unless there has been a manifest abuse of discretion. *Pacific Ry. & Nav. Co. v. Elmore Packing Co.*, 60 Or 534, 542, 120 P 389. At the time of the Elmore Packing Co. decision the applicable words of the statute (now ORS 17.210, supra) were: "unless the court for special reasons otherwise direct". In effect, the words now used in the statute, to-wit: "unless the court for good and sufficient reason otherwise directs" are the same as the language formerly employed. We find no error in the ruling of the trial court that permitted defendant to open and close the case.

■ Leroy D. Draper, a witness for the plaintiff, was called and testified as an expert respecting the value of the property being appropriated. Cross-examination developed the fact that he had testified as an expert upon property valuation for the Highway Commission on many prior occasions. Then, over the objection of plaintiff, the witness was permitted to answer the following question on cross-examination:

"Q I'll hand you a memorandum from which you might refresh your memory, Mr. Draper, and will ask you the amount that the Oregon State Highway Commission had paid you for appraisal work and for testifying in condemnation cases for the period January 1, 1946, to and including August 31, 1953?"

Plaintiff contends that the court erred in overruling its objection to this question, claiming it was improper cross-examination.

It is well settled that a wide latitude is permitted upon the cross-examination of a witness, the scope and extent of such cross-examination resting largely in the sound discretion of the trial court. However, the right of cross-examination and the extent thereof have limitations. The pecuniary interest of a witness, or his prejudice or bias in favor of the party calling him, can always be shown, limited only as to the extent of the inquiry by the sound discretion of the trial judge. If a witness is being paid more than the fixed witness fee for testifying in the case, that fact may be developed on cross-examination. More latitude is permitted in the cross-examination of expert witnesses than is the case with ordinary witnesses, because expert testimony is viewed with some suspicion. The natural bias which the expert may have in favor of the party who employed and is paying him is the chief cause for the discredit that has been cast upon expert testimony as a whole. The questions directed to the witness Draper respecting the number of times he had acted as appraiser and testified for the Highway Commission in condemnation cases was proper cross-examination; also, inquiry might properly be made of him as to the amount of money he was being paid as a witness in this particular case. However, the question as to how much money he had received as an appraiser and witness in prior unrelated cases was improper and the objection thereto should have been sustained. Such an inquiry opened the doors to purely collateral matters. If the question had been proper, it is manifest that the witness would have had the right, in explanation thereof, to show that the fees theretofore paid him

in each case were fully justified by the nature and extent of the services rendered.

In 70 CJ 954, § 1158 (h), it is stated:

"It may be shown, as bearing on the credibility of a witness and the care with which his evidence should be considered, that he has been paid an amount in excess of the regular witness fees, * * *. Thus it may be shown that he has been paid his expenses at the trial, * * *. * * * The fact that upon a former trial of *the same case* the witness received extra compensation may be shown as an indication of his partisanship in the present trial, *but such extra compensation in other distinct previous cases may not be shown.*" (Italics ours.)

In *Furbeck v. I. Gevurtz & Son,* 72 Or 12, 19, 143 P 654, 143 P 922, the court said:

"Where, however, the proposed cross-examination of a witness relates to collateral, irrelevant or immaterial matters, the privilege should be denied: 40 Cyc. 2493."

See *People v. Tomalty,* 14 Cal App 224, 111 P 513; *Seaboard Air Line Ry. v. State,* 23 Ga App 72, 97 SE 549.

We have examined the cases cited by defendant as authority for its position that the cross-examination was proper. Aside from the case of *City of Chicago v. Schaack Bros. Ch. Works,* 330 Ill 264, 161 NE 486, none of the authorities cited conflict in any way with the statement made in 70 CJ 954, supra, and with which statement we agree. The other authorities cited and quoted from by defendant are: *Dempsey v. Goldstein Bros. Amusement Co.,* 231 Mass 461, 121 NE 429; *McMahon v. Chicago City Ry. Co.,* 239 Ill 334, 88 NE 223; Mundo, The Expert Witness, pp 73, 137; Rogers, Expert Testimony, 3d ed, 122, § 62.

■ The trial of this case proceeded upon the theory that the costs of disassembling, removing, and reinstalling the machinery and equipment used by defendant in the manufacture of furniture and mattresses were proper items to be considered in fixing the fair cash market value of the property being taken by the state.

W. H. Rambo was called as a witness by defendant to give his opinion as to these costs; that is, the costs for disassembling, crating, marking, moving, hauling and installation of equipment at new location. Rambo, with his assistants, made a thorough examination of defendant's plant, noting each item of machinery, etc., that was to be removed. He prepared a summary in writing showing each item of property to be removed, and his estimated cost of the labor and material, if any, for the disassembling of such item, finally setting forth the total sum for all items, which was the sum of $10,965. He also set forth the sum of $5,700 as his estimated cost for loading and unloading the property, itemizing the account as to labor, trailer and crane hire. In detail, he set forth each item and the separate estimated costs of labor and material, if any, for the reinstallation of the machinery and equipment in a new location, his total estimated cost being set out as $91,489. On the last page of his summary he set forth the grand total of estimated costs as $108,154.

Rambo is an expert in his line and a man of extensive experience. He testified orally as to most of the matters set forth in his written summary. Over the objection of plaintiff, the summary itself was admitted in evidence. In our opinion its admission constituted prejudicial error.

It will be observed that Rambo was called as an expert to give his *opinion* as to the costs of disassembling, crating, marking, and moving the equipment and installing it at a new location. Reducing his opin-

ion to writing did not change the character of his testimony. It still remained a mere opinion. The writing expressed no fact, except as to the list of machinery and other equipment involved, and had it been confined to that, it might have been admissible. But it would be a dangerous rule, indeed, that permitted expert witnesses to reduce their opinions to writing and then have those mere opinions as so written submitted to the jury as exhibits in the case. Such summaries are a far cry from those summaries of long accounts contained in original books of entry which are sometimes admissible. For example, see *Suetter v. Cornwall et al.*, 102 Or 220, 233, 201 P 1072. The authorities cited by defendant in support of its contention that the exhibit was admissible in evidence are readily distinguishable from the situation now before us. As this question cannot arise upon another trial of this case, it is unnecessary for us to devote any more attention to the matter.

We now come to a consideration of the principal questions involved on this appeal.

Immediately before trial defendant requested and received permission to make certain amendments to its amended answer. It was permitted to amend paragraph IV by substituting in the last line thereof for the words and figures "will exceed the sum of $40,000.00", the words and figures "is the sum of $110,000.00". It also was permitted to amend paragraph VI by substituting the figures "$500,000.00" for the figures "$390,000.00". Its request to further amend paragraph VI by striking therefrom the words "exclusive of the damages referred to above", immediately following the figures "$390,000.00", was denied.

Up to and including the time these amendments were allowed, it is manifest that it was defendant's theory that it was entitled to recover as consequential

damages the costs of disassembling, crating, marking, and moving the equipment and installing it at a new location, in addition to the actual cash market value of the real property being taken. For the first time after the suit was commenced, it indicated a doubt as to the propriety of such a claim for damages, when it asked to amend paragraph VI by increasing the alleged market value of the property to $500,000, and striking therefrom the qualifying words "exclusive of the damages referred to above". After the above amendments were allowed, the claim for disassemblying, etc., remained a separate allegation of special damages. The objection to the striking of the qualifying words was based upon the proposition that by so doing, the defendant would be permitted to change its theory of the case, in that the costs of disassembling, etc., would then be considered in connection with and as a part of the fair cash market value of the land as enhanced by the buildings and improvements thereon, instead of being an item of special damage as theretofore claimed. The trial court sustained plaintiff's contention and refused that portion of the proposed amendment to paragraph VI. However, after the jury had been selected and the trial had proceeded for some time, the court reversed its position and permitted the amendment, over the objection of plaintiff, and a new paragraph VI was substituted, reading as follows:

"That the value of the real property, above described, proposed to be taken by the Plaintiff, together with its improvements thereon and its appurtenances, including the cost of dismanteling the machinery installed therein, preparing the same for removal, the removal thereof, and the re-installation in another similar location, has an actual cash value, at the time of the commencement of these proceedings, of $500,000.00, and Defendant is entitled to interest thereon at the rate of 6% per annum from the date of the commencement of this proceeding,

that being the date of the taking of the said property."

This amendment was a distinct departure from the original theory of the defendant as to the damages recoverable. It was an abandonment of its consequential damage theory. But though defendant abandoned this theory, it, in effect, sought to accomplish the same result by increasing the demand as to the fair cash market value of the property being taken to the exact amount first alleged as that value plus the exact amount of the alleged removal costs. It thus sought to recover indirectly what it apparently had concluded could not be recovered directly. We need not decide in this case whether the trial court erred in permitting this swapping of ''horses while crossing the stream'', because the view we take of the issues on this appeal will render immaterial and irrelevant all allegations of the amended answer and evidence in support thereof relating to removal costs.

Although the admission into evidence of the witness Rambo's written summary of his opinion constituted prejudicial and reversible error, and we might base our decision on this appeal upon that sole ground, nevertheless, in fairness to the parties and to avoid similar error upon a new trial, we are of the opinion that we should and, therefore, will briefly discuss and answer the two principal questions propounded to this court by the briefs and oral arguments of the parties.

Defendant in its brief presents those questions for decision as follows:

''Was evidence of cost of reproduction of the buildings less depreciation, properly admitted and submitted to the jury under the facts developed by the evidence as one of the elements for consideration in arriving at the value of the property? and

"Was evidence of the cost of dismantling, packing and crating 'the fixtures' (not unattached personal property), and the reinstallation thereof, properly admitted and submitted to the jury as an element to be considered in determining the just compensation to be paid for the property?"

■■ It is the well-established rule of this state that where there is a total taking of land for a public use, the just compensation therefor to be paid to the owner is measured by the fair cash market value of the land, as enhanced by the value of the improvements thereon that are considered a part of the realty, valued to its highest and best use. When a part only of a tract of land is taken, consequential damages to that portion not taken, if any, are recoverable by the owner, in addition to the fair cash market value of the part appropriated. *State Highway Com. v. Burk et al.*, 200 Or 211, 251, 265 P2d 783; *State of Oregon v. Cerruti et al.*, 188 Or 103, 112, 214 P2d 346; *Pape et al. v. Linn County*, 135 Or 430, 437, 296 P 65; *Keane et al. v. City of Portland et al.*, 115 Or 1, 235 P 677; *State v. Mohler et al.*, 115 Or 562, 237 P 690, 239 P 193.

■ Market value is the amount which the land would bring if it were offered for sale by one who desired but was not obliged to sell and was bought by one who was willing but not obliged to buy. *Pape et al. v. Linn County*, supra. In determining the fair cash market value of the land condemned there should be taken into account all considerations that might fairly be brought forward and reasonably be given substantial weight in negotiations between the owner and a prospective purchaser.

■ Where land is condemned for public uses, the value of buildings or other permanent improvements and fixtures on the land must be considered in determining the owner's compensation to the extent that they en-

hance the value of the land to which they are affixed, the appropriator being required either to take the land with improvements he finds thereon, or to reject it in toto. No allowance can be made for personal property as distinguished from fixtures affixed to the condemned realty. Buildings and other structures permanently annexed to the land taken by eminent domain, as between an owner and appropriator, are usually regarded as a part of the realty, and their value cannot be considered except in connection with the land. 29 CJS 1044, Eminent Domain, § 175 (1).

 "Fixtures", as that term is used in the law relating to real property, refers to personal property that has lost its character as such because of its annexation to the realty, and, therefore, has become a part and parcel of the land. However, articles which have become realty by reason of annexation may, by severance, become personalty. A severance may be actual or constructive. The abstract right to sever fixtures is inherent in the full dominion over land which ownership confers; and, to be effective, it must be exercised by the owner of the realty. 22 Am Jur 726, Fixtures, § 13.

 On the other hand, "trade fixtures", as that term is understood in the law, are in a class by themselves. Although annexed to the realty, they do not lose their character as personal property and are removable by the owner thereof if such removal can be accomplished without doing substantial injury to the realty. In 22 Am Jur 775, Fixtures, § 61, it is stated:

> "An important exception to the general rule of the common law, that whatever is once annexed to the freehold becomes part of it and cannot afterward be removed except by him who is entitled to the inheritance, exists in the case of structures erected or chattels annexed for the purpose of trade or manufacture. It has been said that the underlying reason why property placed on leased prem-

ises by the tenant for purposes of trade is regarded as personal rather than real is based upon the rule that the law implies an agreement that it shall remain personal property from the fact that the lessor contributes nothing thereto and should not be enriched at the expense of his tenant when it was placed upon the real estate of the landlord with his consent. Furthermore, upon principles of public policy, and to encourage trade and manufactures, it has been held that fixtures which were erected to carry on such business may be removed by the tenant, during his term, and may be deemed personalty for many other purposes, and that such fixtures are removable by a tenant even in the absence of an express stipulation. The right of a tenant to remove trade fixtures is limited by the fact that he must not substantially injure the freehold while the fixtures are being removed, but the mere fact that the trade fixtures must be taken apart or even wrecked to remove them from the premises does not impair the tenant's right of removal. * * *.

"The exception in regard to trade fixtures has no application in the case of annexations by the owner of the land, and fixtures of this character ordinarily pass, as do all other fixtures, to the heir, grantee, or mortgagee of the land."

Also see *Barber, Trustee v. Henry et al.,* 197 Or 172, 181, 252 P2d 802; *Ward v. Town Tavern et al.,* 191 Or 1, 228 P2d 216; *Metropolitan Life Ins. Co. v. Kimball,* 163 Or 31, 94 P2d 1101; *Matthiesen v. Arata,* 32 Or 342, 345, 50 P 1015; *Helm v. Gilroy,* 20 Or 517, 522, 26 P 851.

In *Helm v. Gilroy,* supra, Mr. Justice Robert S. Bean, speaking for the court, said:

"The weight of modern authority, keeping in mind the exceptions as to constructive annexation, admitted by all the authorities to exist, seems to establish the doctrine that the true criterion of an irremovable fixture consists in the united appli-

cation of several tests: (1) Real or constructive annexation of the article in question to the realty. (2) Appropriation or adaptation to the use or purpose of that part of the realty with which it is connected. (3) The intention of the party making the annexation, to make the article a permanent accession to the freehold, this intention being inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the policy of the law in relation thereto, the structure and mode of the annexation and the purpose or use for which the annexation has been made.''

What might be deemed to be a permanent fixture and a part of the realty when annexed by the owner of the land, might not be so considered when annexed by the tenant. A good illustration of this appears in the case of *Metropolitan Life Ins. Co. v. Kimball,* supra. There certain articles of personal property had lost their character as such because of their annexation to a prune dryer by the owner of the land, and were held to be a part and parcel of the realty, although in most part removable without injury to the building; whereas, had the same articles been annexed by a tenant, they would have retained their character as personal property and been removable by him.

Defendant contends, and we agree, that the several items of property described in paragraphs IV and V of its amended answer, when installed by it as necessary parts of the machinery and apparatus used in defendant's manufacturing plant, lost their character as personal property and became and were a part of the realty. *Metropolitan Life Ins. Co. v. Kimball,* supra. Of course, that also is true of the permanent fixtures described in paragraph III of the amended answer,— fixtures which the defendant does not intend to remove.

Throughout the trial defendant maintained that plaintiff was condemning a furniture factory as such;

that because of the machinery and other equipment in the building adapted to the manufacture of furniture and mattresses, the highest and best use to which the land could be put was that of such a factory. With those contentions as its basic premise, defendant then sought to prove that there was no market for the sale of such a factory in Portland or vicinity and, therefore, cash market value of the property could not be established by the usual tests. Defendant introduced evidence to show that there had been no such sales for many years, although its testimony did disclose that there had been at least one recent sale of a furniture factory in Portland, a sale accomplished through the medium of a transfer of corporate stock. But proceeding upon its theory that there was no market for the sale of a manufacturing plant such as it operated, and hence fair cash market value could not be established in the customary manner, defendant contended that it had the right to establish such market value of the land and improvements by (1) proving the cost of reproduction of the building, less depreciation, and by (2) proving the costs it would incur in being compelled to dismantle, crate, remove, and reinstall the machinery and equipment. The trial court, over the repeated objections of plaintiff, and following what it believed to be the prior ruling upon the law by the presiding judge, permitted defendant to proceed accordingly.

Defendant admits throughout its brief, as it admitted upon the trial, that the costs incident to the removal of personal property from the premises being condemned are not items that could be considered in determining the fair cash market value of the land and its improvements. The numerous authorities cited by both parties announce that principle, although there are cases where such removal costs have been given

consideration in determining the value of an unexpired leasehold interest being condemned; that is, in determining the amount of just compensation that should be paid the tenant. Note, 3 ALR2d 286; 18 Am Jur 894, 895, Eminent Domain, § 255.

13. However, it must be conceded by all parties that if market value is capable of being established by the usual tests, recourse may not be had to other considerations such as reproduction and removal costs in determining such value. And even in those exceptional cases, where resort to other considerations than the usual tests for determining market value may be had, the authorities differ upon the question whether evidence of removal and reinstallation costs may be considered.

In 4 Nichols, Eminent Domain 398, § 14.2471, the author states:

"In any discussion of the consideration to be given to the element of 'removal costs' it becomes necessary to distinguish, generally, between buildings, fixtures and other improvements on real property on the one hand, and personal property on the other, and between the rights of the fee owner and those of a lessee."

Continuing, the author says:

"Ordinarily, unless there is statutory authorization therefor or the condemnor and the owner have agreed with respect thereto, *the owner has not the right nor has the condemnor the obligation* to remove buildings, fixtures or other permanent improvements upon real property which has been condemned. Although there is authority to the contrary, it has been held that, in the absence of provision therefor by statute or by agreement of the condemnor and the owner, *consideration need not be given to the element of removal of such improvements.*

*"Where the taking does not include the fixtures and it becomes incumbent upon the owner to remove the fixtures,* the prevailing rule is that the cost of such removal may be considered. This rule is predicated upon the dominant principle of valuation *in all partial taking cases,*—the before and after rule. Upon the application of this principle *the owner is entitled to the difference between the value of the land with the fixtures annexed and the value of the fixtures. The latter factor is diminished by the cost of removal."* (Italics ours.)

These latter rules have no bearing in the instant case because (1) by its complaint plaintiff simply described the entire parcel of real property it sought to condemn, which would include the land and its improvements (fixtures included); it in no way made a distinction between the land itself and the buildings and fixtures thereon; no allegation of the complaint made it incumbent upon defendant to remove the fixtures, and upon the trial plaintiff's counsel repeatedly stated that the state was condemning the realty and everything properly considered a part thereof; and (2) defendant did not attempt to establish consequential damages as such (under the before and after rule that prevails in partial taking cases) by showing "the difference between the value of the land with the fixtures annexed and the value of the fixtures", the value of the fixtures being diminished by the cost of removal. As we shall later point out in more detail, removal of the fixtures in this case was defendant's own idea, announced first in its answer. Plaintiff had no right to compel such removal. It was under obligation to take the whole of the realty (which included all improvements and fixtures) or to reject it in toto. 29 CJS 1044, Eminent Domain, § 175 a. (1). See also *Kansas City Southern Ry. Co. v. Anderson,* 88 Ark 129, 113 SW 1030; *in re Post Office Site in Borough of the*

*Bronx,* 210 F 832; *People v. Johnson,* 219 NYS 741, 744, 219 AD 285; 18 Am Jur 893, Eminent Domain, § 254. It is true that plaintiff had no use whatever for either the building or the fixtures in the construction of the proposed highway, and perhaps had no objection to the defendant's treatment of the fixtures in the light of removable ''trade fixtures'', or personal property rather than real property, but at no time did it agree, expressly or impliedly, to the severance of anything that was a part and parcel of the realty.

Peculiar circumstances warranting a resort to other considerations than the usual tests for determining market value are set forth in 4 Nichols, Eminent Domain 133, § 12.32, as follows:

''It occasionally happens that a parcel of real estate taken by eminent domain is of such a nature, or is held or has been improved in such a manner, that, while it serves a useful purpose to its owner, if he desired to dispose of it he would be unable to sell it at anything like its real value. A church, or a college building, or a club-house located in a town in which there was but one religious society, or college, or club, might be worth all it cost to its owners, but it would be absolutely unmarketable. * * *. Even such a piece of property as a mill site or a reservoir site, or a factory or store of abnormal size may, to a somewhat lesser degree, be difficult to dispose of, though of great value to its owner.

''In such a case as similar property is not commonly bought and sold it is impossible to ascertain market value by the usual tests. In fact, as market value presupposes a willing buyer, the conditions upon which such value is based are not present, and it is sometimes said that in cases of this character market value is not the measure of compensation. As it is conceded that the owner cannot on that account be deprived of his property without any compensation whatever, some other measure is sought.

It must, however, be remembered that market value is always based upon hypothetical conditions, and that it is never necessary to show that there was in fact a person able and willing to buy. The measure is still what another religious society, or college, or club, or public service corporation, or abutting owner, would pay if there were one at hand; in other words, the measure is still market value. However, since the usual means of ascertaining market value are lacking, other means must from the necessity of the case be resorted to. It is, therefore, proper in such cases to deduce market value from the intrinsic value of the property, and its value to its owners for their special purposes. * * *.

"So long as there is an ascertainable market value no consideration need be given to value peculiar to the owner. * * *."

It is manifest that the improvements upon the land involved in the instant litigation are not of the type mentioned by Nichols as presenting exceptions to the general rule for determining market value.

Defendant argues that even under the willing seller and willing buyer test of market value, removal costs of the seller should be considered, because a seller would always take those costs into consideration in fixing the price at which he would be willing to sell. Perhaps that is true, but it does not mean that he would find a buyer willing to pay such costs in addition to the actual value of the property itself. It takes two to make a bargain, a willing buyer as well as a willing seller. In 1 Orgel, Valuation under Eminent Domain 305, § 68, the subject is discussed as follows:

"The mere fact that the particular owner who transfers his premises to someone else must incur considerable outlays in moving his valuables to another location, while it has a decided effect on the value of these premises to *himself*, has no perceptible bearing on their market value. A court

would therefore have to disregard these expenditures if it accepted market value of the premises as the real measure of compensation."

In note 2, appended to § 68, on page 306, we find the following discussion:

"In saying 'no perceptible bearing' we recognize the possibility that the painful and expensive necessity of moving might stimulate the owner to hold out for and secure a better price for his property than he would otherwise be induced to take. His very reluctance to sell may increase his success as a negotiator. But neither a court, nor an expert appraiser would be likely to be influenced by such subtle, psychological factors in the bargaining process.

"It should be noted that the prospective cost to a buyer of moving into new premises tends to depress the demand price for real estate, and that the cost of moving out of old premises tends to enhance that price. Whether or not these two offsetting tendencies, cancel themselves in their effect on the general level of real-estate values is a question for the economic theorist who is interested in long-run 'normal' values. For the courts and the appraisal experts it is a question of no professional interest, since the effect of these counter-balancing forces (whatever it may be) is reflected in the prices actually established in the real-estate market."

In condemnation proceedings the relationship of condemnor and condemnee is deemed to be the same as that of buyer and seller of the realty or mortgagor and mortgagee thereof, with all the legal consequences of such relationship applicable to the property being taken.

As before noted, in determining the measure of just compensation that should be paid by the condemnor, a different rule has sometimes been applied in cases involving unexpired leasehold interests from that usually applied in situations dealing with the freehold interest. Many cases point out the distinction. As typical

of such cases, attention is called to *U.S. v. General Motors Corp.*, 323 US 373, 379, 65 SC 357, 89 L ed 311. In that case an unexpired leasehold interest was involved. The court held that the reasonable cost of removing the leaseholder's stored property and preparing the space for occupancy by the government—including labor, materials, transportation, and possibly the cost of temporary storage and returning the goods to the premises—may be proved, not as independent items of damage but as elements affecting the price which would be asked and paid for temporary removal. The court also held that the leaseholder was entitled to compensation for the destruction, damage or depreciation in value of fixtures and permanent equipment, not as part of but in addition to the value of the occupancy. However, in its discussion of the issues, the court said:

> "The sovereign ordinarily takes the fee. The rule in such a case is that compensation for that interest does not include future loss of profits, *the expense of moving fixtures* and personal property from the premises, the loss of good-will which inheres in the location of the land, or other like consequential losses which would ensue the sale of the property to someone other than the sovereign. No doubt all these elements would be considered by an owner in determining whether, and at what price, to sell. No doubt, therefore, if the owner is to be made whole for the loss consequent on the sovereign's seizure of his property, these elements should properly be considered. *But the courts have generally held that they are not to be reckoned as part of the compensation for the fee taken by the Government.*" (Italics ours.)

See also *Certain Parcels of Land, etc. v. U.S.*, 57 F Supp 768; *In re Post Office site in Borough of the Bronx, supra*; 29 CJS 1050, Eminent Domain, § 175 b.; 1 Orgel, Valuation under Eminent Domain 306, § 69.

In *Ranlet v. Railroad,* 62 NH 561, the court said:

"* * * As the title to all property is held subject to the implied condition that it must be surrendered whenever the public interest requires it, the inconvenience and expense incident to the surrender of the possession are not elements to be considered in determining the damages to which the owner is entitled. A land-owner is not entitled to the expense of removing personal property from the land taken. Cent. Pacific Railroad Co. v. Pearson, 35 Cal. 247."

At page 311, § 70, 1 Orgel, Valuation under Eminent Domain, the author makes the following statement.

"The decisions have not, however, been unanimous in denying compensation for removal costs and injuries to personal property. Some courts have allowed recovery, generally basing their holdings on the construction of a constitutional or statutory provision, but occasionally on the ground that market value in the particular case was not the applicable standard of compensation."

As an example of the first type of reasoning, the author cites and comments upon the case of *Blincoe v. C., O. & W. Ry. Company,* 16 Okla 286, 83 P 903, 4 LRA NS 890, 8 Ann Cas 689. Defendant also cites this Oklahoma decision in support of its contentions in the instant case. The decision in that case (where removal costs were allowed) was based upon a statute of Oklahoma which the court held contemplated the allowance of removal costs. Along the same line, the author cited and quoted from the case of *City of Richmond v. Williams,* 114 Va 698, 77 SE 492. Commenting upon these two cases, the author says (p 314):

"The results reached in the two cases just quoted were apparently not determined by the form of the constitutional provision. In the *Blincoe* case, the constitution was in the form of the Fifth Amendment, in terms requiring compensation only for

property taken, while in the *Williams* case, the constitutional provision forbade the taking or damaging of property without just compensation. That a constitutional requirement of compensation for property damaged does not compel an award for removal costs or breakages of personal property is made even clearer in other cases."

The author of the note appended to the Blincoe case in 8 Ann Cas 689, 696, comments as follows:

"The question whether compensation may be allowed in condemnation proceedings for damages resulting to personalty, or for the cost of removing it from the condemned premises, depends largely on the interpretation placed upon the constitutional and statutory provisions in the several jurisdictions, giving the right to compensation for property taken in such proceedings. The majority of the courts hold that compensation cannot be recovered in such cases, either for damages resulting to personal property or for the cost of removing it from the premises."

Orgel also discusses the case of *Harvey Textile Co. v. Hill,* 135 Conn 686, 67 A2d 851, at page 315, Vol. 1, of his work. In the instant case defendant relies quite heavily upon this Connecticut decision. Defendant in that case took plaintiff's land and a factory building for highway purposes. The question was whether plaintiff was entitled to an allowance of $5,000 as the cost of disassembling, moving, and reassembling the machines in the factory. The court held that plaintiff was entitled to recover that sum, in addition to the value of the building and of the land. The decision was based upon the statute which provided that in such cases the owner of the land taken by the state should be paid "for all damages". The court said:

"* * * Since the statute provides for the recovery of 'all damages' and since everything by which the value is legitimately affected is to be considered, the only remaining question is whether

the necessity of removing the machinery legitimately affected the market value of the property.''

"A simple illustration will bring out the application of these principles to the case at bar. An owner would demand a higher price for a factory containing complicated and valuable machinery than he would for the same building idle and empty, because he would be faced with the necessity of moving his machinery to save it. His willingness to sell would be affected by this consideration, which would thus enter into the fixing of a fair market value. It was therefore the duty of the trier to consider this element in arriving at the fair market value, not as a separate specific sum of money to be added to the value of the land but as evidence tending to prove its fair market value.''

In commenting upon this decision, Orgel states:

"Thus the court undertakes to apply the 'willing seller, willing buyer,' test but in so doing overlooks the natural reluctance of the ordinary buyer seeking a factory to pay the increased price which the owner would demand.''

The Connecticut statute is much broader in its terms than is that of Oregon. Moreover, we reject the reasoning employed in that decision based upon a "willing seller" attitude. As is suggested by Orgel, and as we have heretofore pointed out, in considering market value the attitude of the buyer must not be overlooked.

We have examined all of the more than one hundred authorities cited to us by the respective parties. There are seeming conflicts among the decisions, but when the decisions are read and carefully analyzed, it will appear that in most cases the apparent differences arose because of special constitutional or statutory provisions, or the peculiar state of facts present. It would unnecessarily prolong this opinion to comment on all the authorities cited, distinguishing them when possible and rejecting their reasoning when that seemed proper, but we wish it understood that we have given

consideration to all of them. We are of the opinion that under the established law of this state, and in keeping with the clear weight of authority, removal costs under the existing facts were not recoverable as consequential damages, nor, in view of the record before us, particularly the pleadings, could they be considered in determining the fair cash market value of the realty being taken by plaintiff; the admission of evidence respecting such costs constituted error. We also are of the opinion that inasmuch as the property being appropriated had a market value that could be determined by the usual tests, it was error to admit evidence respecting reproduction costs, less depreciation, as to the buildings, as a means of fixing such market value.

In its brief defendant asserts that plaintiff elected not to take the fixtures, and, therefore, it will be forced to remove them. That is not an accurate statement. The plaintiff made no such election, either in its pleadings or on the trial, although at the outset of the trial defendant moved the court for an order requiring plaintiff to elect. In opposing the motion, plaintiff stated, and throughout the proceedings consistently maintained, that it was taking everything that might be properly considered a part and parcel of the realty. It was defendant who made the choice, and it did so when it filed its answer. In its answer defendant particularly described the items of machinery and other apparatus it proposed to remove from the building (paragraphs IV and V of the amended answer), asking damages for the removal costs. By so doing as an owner, defendant, in effect, elected to treat the fixtures in the light of "removable trade fixtures", or, in other words, as personal property. In its instructions to the jury, the trial court described the machinery and equipment to be removed as "trade fixtures". In the absence of objection by plaintiff, defendant had the

right, as owner of the land, to sever the fixtures from the freehold, and, upon such severance, they immediately resumed their former status as personal property. As before observed, a severance may be actual or constructive. The effect of defendant's answer was to create a constructive severance. 22 Am Jur 726, Fixtures, § 13, supra. Therefore, the fixtures must be considered as personal property, with all the attendant legal consequences.

With the machinery and other manufacturing equipment removed from the building, there remained only an empty warehouse building to be taken by the state, except for the few fixtures described in paragraph III of the amended answer. With the machinery, etc., installed in the building, it is obvious that the highest and best use of the premises was that of a furniture and mattress factory, but with the machinery and other equipment removed, and as an empty building, it had many other uses. The building is adaptable for storage and warehouse (its original purpose) purposes, as well as for manufacturing purposes for other types of goods, if the proper machinery were installed therefor. The railroad spur track into the premises, with the accessibility of the land to employes, its location as being readily available to customers, are all advantages that might apply to any manufacturing business conducted in the building; those advantages are not peculiar to the business of a furniture and mattress factory. All those elements are properly considered in fixing the cash market value of the property, but not as separate items for which compensation should be paid.

There is no question that empty warehouse buildings of the type and construction of the building involved in this litigation have a market value in the city of Portland and vicinity, and that such market value may easily be established in the usual manner.

The instructions of the trial court, to which exceptions were taken by plaintiff, were in keeping with the theory of the law it embraced and followed throughout the trial. That theory of the law being erroneous, it follows that the instructions to the jury based thereon were improper.

On its cross-appeal from the judgment rendered in its favor, defendant contends that the trial court erred in not allowing interest on the judgment from the date of the commencement of this action, instead of from the date of the judgment.

■ That question is no longer an open one in this state. Interest on an award of compensation for the condemnation of property for highway purposes is allowable only from the time actual possession of the property is taken, or from the date of the judgment, whichever may first occur, and its allowance is not fixed as of the date of filing the complaint in the condemnation action. *State Highway Commission v. Sauers et ux.*, 199 Or 417, 262 P2d 678. In this case actual possession of the premises yet remains in the defendant.

It is unnecessary for us to pass upon the question of recoverable costs and disbursements at this time, although the matter was presented on this appeal.

The judgment is reversed and the cause remanded for a new trial.