727 A.2d 930

**Linda J. WROBLESKI**

v.

**Nora de LARA.**

**No. 88, Sept. Term, 1998.**

Court of Appeals of Maryland.

April 16, 1999.

Kreg Paul Greer (Law Office of Kreg Paul Greer, on brief), Bel Air, for Petitioner.

Ronald U. Shaw (Shaw & Brown, P.A., on brief), Towson, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

This is a medical malpractice case. Linda Wrobleski claimed that Nora de Lara negligently damaged Ms. Wrobleski's small intestine during a laparoscopic procedure performed by Dr. de Lara on June 6, 1994. That damage led to significant complications, resulting in a lot of pain to Ms.

Wrobleski and the need for two corrective surgeries. A jury in the Circuit Court for Baltimore City found no negligence on Dr. de Lara's part, and from the judgment entered upon that verdict, Ms. Wrobleski appealed. The Court of Special Appeals affirmed. *Wrobleski v. de Lara*, 121 Md.App. 181, 708 A.2d 1086 (1998). We granted *certiorari* to consider whether the trial court erred in allowing defense counsel to question one of Ms. Wrobleski's medical expert witnesses as to how much money the witness had earned in 1995 from testifying as an expert. We agree with the Court of Special Appeals that there was no error in permitting the question.

### BACKGROUND

The facts underlying the claim of negligence are not especially important in terms of the single issue before us and may be quickly summarized. As the result of complaints of pain in the pelvic area and other symptoms exhibited by Ms. Wrobleski, Dr. de Lara performed a laparoscopy, to examine the pelvic area. During the laparoscopy, Dr. de Lara found a number of adhesions in Ms. Wrobleski's abdominal cavity. Part of the omentum—a fatty apron that covers the front part of the abdominal wall—had adhered both to the abdominal wall and to part of the small intestine. Dr. de Lara removed the adhesions with a pair of surgical scissors.

It is undisputed that some damage was done to the small intestine during that removal. Whether through an actual puncture or as the result of necrosis arising from other trauma, a perforation occurred, which allowed contents of the intestine to leak into the abdominal cavity. That is what created at least some of the ensuing pain, an infection, and the need for corrective surgery. The experts disagreed both as to what caused that perforation and as to whether the perforation resulted from negligence on Dr. de Lara's part. The two medical experts who testified for Ms. Wrobleski—Drs. Battle and Lilling—asserted that Dr. de Lara was negligent, although for somewhat different reasons. The three medical experts who testified for Dr. de Lara concluded that there was no negligence—that Dr. de Lara's conduct was within the

appropriate standard of care and that the perforation was not the result of negligence on her part. The issue of negligence, in other words, involved a classic disagreement among the experts.

When Dr. Battle—the first expert—was called, defense counsel elicited, without objection, that the witness had testified some 50 to 60 times for medical malpractice plaintiffs, that about 25 of those appearances had been for clients of Mr. Ellin, who served as Ms. Wrobleski's attorney, and that, in the preceding twelve months, Dr. Battle had earned between $30,000 and $50,000 from testifying as an expert, which amounted to about 15% of his income. Most of those earnings, he said, were derived from Mr. Ellin's cases. Dr. Battle stated that about 80% of his appearances had been on behalf of plaintiffs. To blunt the unfavorable implications from that testimony, Mr. Ellin brought out that, in about half of the cases Dr. Battle reviewed for him, the doctor opined that there was no malpractice and that, to the best of Dr. Battle's knowledge, Mr. Ellin did not take those cases.

What provoked this appeal was a similar effort directed at Dr. Lilling. It appears that, during Dr. Lilling's pretrial deposition, the doctor disclosed how much he had been paid by Mr. Ellin for his services in the Wrobleski case and stated that the total amount he earned from testifying as an expert witness was less than 20% of his total income, but he refused to reveal the total amount of income he received from testifying as a witness.[1] At trial, counsel asked Dr. Lilling whether

---

1. Dr. Lilling's response that less than 20% of his income was derived from testifying as a witness may have been prompted by Maryland Code, § 3–2A–04(b) of the Courts and Judicial Proceedings Article. That section requires that a claim filed against a health care provider be dismissed unless, within 90 days after filing the claim, the claimant files a certificate of a qualified expert attesting (1) to the defendant's departure from standards of care, and (2) that the departure was the proximate cause of the claimant's injury. Section 3–2A–04(b)(4) provides that the attesting expert "may not devote annually more than 20 percent of the expert's professional activities to activities that directly involve testimony in personal injury claims." The purpose of that provision, presumably, is to set a qualification (or disqualification) for

he was prepared to tell the jury how much he made in 1995 from testifying as an expert, and the witness again refused. The basis of his reticence seemed to be his belief that, having stated that less than 20% of his income was derived from his services as a witness, disclosure of the amount of that income would be tantamount to revealing his gross income, which he said was none of counsel's business.[2] Ms. Wrobleski objected to questioning Dr. Lilling about the total income he received from testifying. She had no objection to questioning the witness as to income earned from Mr. Ellin but asserted that any inquiry beyond that was irrelevant. The court overruled the objection but did not require Dr. Lilling to answer the question. Once again, the question was put whether the witness was willing to disclose the information, and once again the witness declined. He did reveal that he had earned $27,000 from Mr. Ellin's cases in 1995.

Relying principally on an intermediate appellate decision from Pennsylvania, Ms. Wrobleski asserts that allowance of the unanswered question was error. She attributes the unfavorable jury verdict to that question, contending that the only reason the jury could have for ignoring her injuries was its belief that Dr. Lilling was trying to hide something from it. In light of the other evidence in the case, that causal connection is tenuous at best, but we shall accept it for purposes of this appeal.

---

service as a medical expert with respect to those kinds of claims. Section 3–2A–04(b)(4) does not, as Dr. Lilling may have supposed, directly apply the 20% limit to the expert's income, although the percentage of income may be an important indicator of the amount of activity devoted to testifying. Also relevant, of course, is whether the witness charges more or less per hour for testifying than for practicing medicine.

2. As Judge Salmon pointed out for the Court of Special Appeals, "[k]nowledge that Dr. Lilling made 'less than 20 percent' of his yearly income as an expert, coupled with knowledge as to how much he earned annually as an expert, would not provide the questioner with even a rough approximation of the witness's annual income because 'less than 20 percent' could mean anything from .01 percent to 19.99 percent." *Wrobleski v. de Lara, supra*, 121 Md.App. at 186 n. 2, 708 A.2d at 1088 n. 2.

## DISCUSSION

██ Although expert witnesses play a vital, indeed a necessary, role in the trial of certain cases, the law, both here and in England, has long viewed their procurement by, and appearance on behalf of, parties to the litigation with some misgiving. As long ago as 1858, the Supreme Court noted that "opposite opinions of persons professing to be experts, may be obtained to any amount." *Winans v. New York & Erie Railroad*, 62 U.S. (21 How.) 88, 101, 16 L.Ed. 68, 71 (1858). In his 1864 treatise on Evidence, Judge Taylor observed:

> "Perhaps the testimony which least deserves credit with a jury is that of *skilled witnesses*. These gentlemen are usually required to speak, not to facts, but to *opinions*; and when this is the case, it is often quite surprising to see with what facility, and to what an extent, their views can be made to correspond with the wishes or the interests of the parties who call them."

JOHN P. TAYLOR, A TREATISE ON THE LAW OF EVIDENCE AS ADMINISTERED IN ENGLAND AND IRELAND, 4th ed. (1864), § 50 at 72 (emphasis in original).

Writing in 1893, Professor Charles Himes quoted Taylor's statement and added his own view that expert witnesses "are selected on account of their ability to express a favorable opinion, which, there is great reason to believe, is in many instances the result alone of employment and the bias growing out of it." 135 J. Franklin Inst. at 409 (1893). In an 1897 address to the New Hampshire Medical Society, EXPERT TESTIMONY—PREVALENT COMPLAINTS AND PROPOSED REMEDIES, reprinted in 11 HARV. L.REV. 169 (1897), Judge William Foster, though disagreeing with Professor Himes's general inference of bias, nonetheless recognized, even then, that "[t]his 'bias,' or inclination in favor of the party by whom the witness is employed, is probably the most frequent complaint of all against the expert witness." *Id.* at 171.

These concerns have certainly not dissipated over the years; if anything, they have increased. Wigmore noted the "dis-

trust of the expert witness, as one whose testimony is shaped by his *bias for the party calling him.*" 2 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 563, at 761 (Chadbourn rev.1979) (emphasis in original). In proposing Federal Rule of Evidence 706, which codified the authority of the court to appoint its own expert witness, the Advisory Committee commented that "[t]he practice of shopping for experts, the venality of some experts, and the reluctance of many experts to involve themselves in litigation, have been matters of deep concern." Professor Michael Graham, of the University of Illinois Law School, has observed:

> "The professional expert witness advocating the position of one side or the other has become a fact of life in the litigation process. Practicing lawyers can quickly and easily locate an expert witness to advocate nearly anything they desire. In each part of the country, if you need an expert medical witness to state that plaintiff suffered a whiplash injury, call expert X; if you need a medical expert to dispute that fact, call expert Y. The use of the expert witness has become so prevalent that certain expert witnesses now derive a significant portion of their total income from litigated matters."

MICHAEL H. GRAHAM, IMPEACHING THE PROFESSIONAL EXPERT WITNESS BY A SHOWING OF FINANCIAL INTEREST, 53 Ind. L. Jour. 35 (1977). Experts of all kinds regularly advertise their services to lawyers in the legal periodicals and newspapers. *See, for example,* any recent issue of the AMERICAN BAR ASSOCIATION JOURNAL or TRIAL, the JOURNAL OF THE ASSOCIATION OF TRIAL LAWYERS OF AMERICA.[3]

---

**3.** The criticism generated by the adversarial system is not one-sided. Some experts have contempt for the litigation process and, as a result, refuse to testify. Many experts feel that "not only is the process of providing evidence difficult and time consuming, but that they are treated in a demeaning manner, and that their evidence is poorly used." Samuel R. Gross, *Expert Testimony,* 1991 WIS. L.REV. 1113, 1135 (1991). Professor Gross notes:

> "Reading the comments of lawyers and judges, it is easy to get the impression that expert witnesses are intruders who disrupt the judicial search for truth. This is false, of course. As Karl Menninger

Expert opinion testimony can be powerful evidence. In some cases and on certain issues, it is essential to have in order to present a triable issue, but even if not legally required, it can have a compelling effect with a jury. That is why, especially with expert witnesses, "[w]ide latitude must be given a cross-examiner in exploring a witness's bias or motivation in testifying," why, in particular, "the cross-examiner must be given latitude to cross-examine a witness concerning any bias or interest the witness may have that would lead the witness to shade his testimony, whether consciously or not, in favor of or against a party." *Ware v. State*, 348 Md. 19, 67, 702 A.2d 699, 722 (1997), quoting in part from *Bruce v. State*, 318 Md. 706, 727, 569 A.2d 1254, 1265 (1990), *cert. denied*, 508 U.S. 963, 113 S.Ct. 2936, 124 L.Ed.2d 686 (1993); *see also Colvin-el v. State*, 332 Md. 144, 169, 630 A.2d 725, 737 (1993).

Exposure of potential bias based on self-interest is often attempted through cross-examination directed at how much the witness is being paid for his or her services in the case at bar, the frequency with which the witness testifies in similar kinds of cases, whether the witness customarily appears for a particular type of party (usually plaintiff or defendant), whether the witness is frequently employed by a particular party or attorney and, if so, how much income the witness derives from that employment, and, as in this case, the amount or the percentage of the witness's total income that is derived from lawyer referrals or testimony in lawsuits. Some forms of inquiry seek to uncover a specific and enduring relationship between the witness and the party or attorney, from which a direct bias may be inferred. Others are directed at exposing the more subtle problem of the professional "hired gun," who earns a significant portion of his or her livelihood from testifying and, rather than having a tie to a specific party or attorney, may have a general economic interest in producing

pointed out, the expert 'is not self invited to these parties. He is not a trespasser. He is called, then he is questioned, criticized, disputed, attacked, suspected, disregarded and ridiculed.' The expert witness that lawyers vilify is a creature of their own creation."
*Id.* at 114–15 (footnote omitted).

favorable results for the employer of the moment. As noted by Russell G. Donaldson, Annotation, *Propriety of Cross-examining Expert Witness Regarding His Status as "Professional Witness,"* 39 A.L.R.4th 742, 746 (1985):

> "That an expert in a particular field may be in effect a 'professional witness' in lawsuits, rather than being more or less exclusively a practitioner whose employment in a lawsuit as a witness is merely incidental to his or her profession, is a matter which is likely to bear on the credibility of that expert, since a significant portion of the expert's livelihood may thus depend on his or her desirability as a favorable and convincing witness, thus possibly leading to a temptation for the witness to color findings and testimony to suit the needs of the proponent party, rather than to evaluate and present the subject matter of the testimony with complete impartiality."

Other than trotting out one's own experts, exposure of financial interest bias may sometimes be the most effective challenge that can be made to an expert's testimony, especially that of a witness skilled in the art of testifying. As Professor Graham points out, substantive cross-examination is often very difficult. With their extensive litigation experience, "professional witnesses" are "proficient in the art of expert witness advocacy" and "at ease with the material and capable of making fine line distinctions between the current situation and those raised in the questions of examining counsel." Graham, *supra*, 53 Ind. L. Jour. at 40–41. The cross-examiner may well be concerned that the jury will view extensive or sharp questioning about the details as unnecessary quibbling.

█ The amount of money that a witness is paid for testifying in the particular case is unquestionably disclosable on cross-examination. The dispute, on grounds of relevance, arises from questions seeking information on amounts earned from testifying generally, which necessarily includes amounts earned from testifying in other litigation.

We have dealt with the issue only indirectly. In *Ager v. Baltimore Transit Co.*, 213 Md. 414, 427–28, 132 A.2d 469

(1957), we held that there was no error in permitting defense counsel to ask the plaintiff's medical expert how many times he had examined persons referred by plaintiff's counsel. In *Scott v. State*, 310 Md. 277, 529 A.2d 340 (1987), the defendant in a death penalty case challenged the qualification of a psychiatrist called by the State due to his frequent appearances as a State's witness in capital cases, claiming that he was a "professional witness." We rejected the challenge as being relevant to the witness's qualification as an expert, but, citing *Ager*, we confirmed that "[e]vidence tending to show that an expert witness has frequently testified or otherwise been involved in litigation for one party directly relates to the weight a jury may give the testimony," necessarily implying that such a connection could be explored on cross-examination. *Scott, supra*, at 294, 529 A.2d at 348. To date, that is as far as we have had occasion to go. In *Mezzanotte Const. Co. v. Gibons*, 219 Md. 178, 181, 148 A.2d 399, 401 (1959), we noted generally that "the compensation of an expert witness is a proper subject for cross-examination" and that the scope and extent of such examination is within the discretion of the trial judge. In *Kruszewski v. Holz*, 265 Md. 434, 290 A.2d 534 (1972), a plaintiff complained that, although the court allowed defense counsel to question her medical expert concerning his recent participation in several malpractice cases, it declined to allow her to question the defendant's expert about his having been a party to a malpractice suit in which defense counsel was his attorney. Though confirming that cross-examination to establish bias is permissible, we held that, as the bias of the witness had already been shown in other ways, the trial court did not abuse its discretion in not allowing the question. *Id.* at 440, 290 A.2d at 538.

Only a few courts have dealt directly with the issue before us, and there seems to be some split of authority. A slight majority of the courts that have considered the issue have allowed expert witnesses to be questioned about income earned from their forensic activities and have rejected the various arguments mounted by Ms. Wrobleski in this case. The clearest example is *Trower v. Jones*, 121 Ill.2d 211, 117

Ill.Dec. 136, 520 N.E.2d 297 (1988). *Trower* also was a medical malpractice case in which defense counsel was allowed to cross-examine the plaintiff's medical expert as to (1) the frequency with which he testified for plaintiffs rather than defendants, and (2) the annual income derived from services related to testifying as an expert witness. In earlier cases, the Illinois Supreme Court had generally curtailed (or blessed the curtailing of) that kind of inquiry but because, in the court's view, both the difficulty and the importance of thorough cross-examination of expert witnesses had markedly increased in the intervening years, it determined that a more liberal rule was required. Effective cross-examination of expert witnesses had become more difficult because of the increased latitude given to experts by the modern rules of evidence, allowing them, for example, to express an opinion without prior disclosure of the facts supporting the opinion and to base an opinion on inadmissible evidence if that evidence was reasonably relied upon by experts in the field. Picking up Professor Graham's theme, the *Trower* court continued:

"Adding to the importance of effective cross-examination is the proliferation of expert 'locator' services which, as a practical matter, can help the litigants of either side of most any case find an expert who will help advocate the desired position. As this case helps illustrate, many experts today spend so much of their time testifying throughout the country that they might be deemed not only experts in their field but also experts in the art of being a persuasive witness and in the art of handling cross-examination."

*Id.* 520 N.E.2d at 299.[4]

As does Ms. Wrobleski here, the plaintiff in *Trower* argued that inquiry regarding an expert witness's financial interest should be limited to the remuneration received for testifying

---

4. The witness in *Trower* had testified in over a dozen states on a variety of medical subjects. Dr. Lilling, in this case, practiced principally in New York but had testified, mostly for plaintiffs, in 14 States, ranging from Maine to Louisiana and Illinois.

(1) in the particular case, (2) for a particular party, or (3) for a particular party's attorney. For the reasons stated in the A.L.R. Annotation, quoted above, the court rejected those limitations, noting that "[a] favorable verdict may well help [the witness] establish a 'track record' which, to a professional witness, can be all-important in determining not only the frequency with which [the witness] is asked to testify but also the price which [the witness] can demand for such testimony." *Id.* 520 N.E.2d at 300. The court found wanting the additional arguments that allowing such an inquiry would inject collateral issues into the trial, such as the reasonableness of the fees charged by the witness, and that it would complicate the discovery process by creating conflicts between the need to discover impeachment evidence and various evidentiary privileges, such as the physician-patient privilege. Both of those problems, it held, could be controlled by the trial court and did not suffice to keep relevant information from the jury. *See also Aguinaga v. City of Chicago,* 243 Ill.App.3d 552, 183 Ill.Dec. 648, 611 N.E.2d 1296 (1993) (following *Trower*).

The Fifth Circuit Court of Appeals took a somewhat similar position in *Collins v. Wayne Corp.,* 621 F.2d 777 (5th Cir. 1980). The witness there was an accident reconstruction expert called by the plaintiffs in a crash-worthiness product liability case, who was asked about fees received for testifying in earlier cases. Finding no error, alternatively to finding that no proper objection had been made, the court observed that "[a] showing of a pattern of compensation in past cases raises an inference of the possibility that the witness has slanted his testimony in those cases so he would be hired to testify in future cases." *Id.* at 784. In *Simon v. Clark,* 660 N.E.2d 634, 636–37 (Ind.App.1996), the Indiana court held that cross-examination of a defense medical expert regarding the compensation he had received in the preceding year for performing evaluations for defense attorneys was permissible, although in the particular case, the evidence would have been cumulative and, for that reason, an objection was properly sustained.

Missouri, Texas and Michigan have adopted that view as well. In *State ex rel. Lichtor v. Clark*, 845 S.W.2d 55 (Mo. App.1992), the plaintiff in a personal injury case objected to being examined by a physician selected by defense counsel, complaining that the doctor was biased. In the context of resolving that discovery dispute, the court discussed the problem of biased expert witnesses and, citing *Trower*, held that "the trial judge in this case has discretion to allow testimony as to the amount of annual income derived from employment as an expert witness." *Id.* at 65. *Cf. Elam v. Alcolac, Inc.*, 765 S.W.2d 42 (Mo.App.1988), *cert. denied*, 493 U.S. 817, 110 S.Ct. 69, 107 L.Ed.2d 36 (1989) (a complex environmental pollution case where the compensation sought to be inquired into covered an extensive array of services, far beyond forensic ones, that were provided, in part, by persons other than the witness). In *Barrios v. Davis*, 415 S.W.2d 714 (Tex.Civ. App.1967), the court found no error in allowing a medical expert witness to be asked about the number of cases he had testified in, the fees he charged, and the amount he had collected in one year in cases referred to him by lawyers. See also *Russell v. Young*, 452 S.W.2d 434 (Tex.1970), in which, though limiting the scope of discovery into a witness's financial records, the court confirmed that "in order to show bias and prejudice an expert medical witness may be cross-examined regarding the number of times he has testified in lawsuits, payments for such testifying and related questions." *Id.* at 436.

In *Wilson v. Stilwill*, 411 Mich. 587, 309 N.W.2d 898 (1981), the plaintiff's medical expert witness was questioned about the frequency with which he testified in malpractice cases, although it does not appear that he was asked about the extent of his income from that activity. Finding no error, the Michigan Supreme Court held that the fact that a substantial part of the witness's practice involved giving disability evaluations and preparing reports of his findings was not "an improper subject for general limited inquiry," noting that "[a]n expert witness's experience testifying in court may influ-

ence the manner in which he or she testifies." *Id.* 309 N.W.2d at 902.

Four States have ruled out questions relating to the amount or percentage of income derived by an expert witness from testifying. In *Weaver v. Georgia Power Company,* 134 Ga. App. 696, 215 S.E.2d 503 (1975), expert appraisers testifying for a condemning authority admitted that they did appraisals on a fee basis and for parties other than the condemnor. The court held that those admissions sufficiently put to the jury the issue of the experts' credibility and interest and that it was not error for the trial court to sustain objections "to questions seeking to elicit from the witnesses the amount of their fees." *Id.* 215 S.E.2d at 504. In *State v. Superbilt Manufacturing Co.,* 204 Or. 393, 281 P.2d 707 (1955), the Oregon Supreme Court held that it was improper to ask the State's expert appraiser how much the Highway Commission had paid him for appraisal work and testifying during the preceding seven years. The court recognized that " [m]ore latitude is permitted in the cross-examination of expert witnesses, because expert testimony is viewed with some suspicion" and that "[t]he natural bias which the expert may have in favor of the party who employed and is paying him is the chief cause for the discredit that has been cast upon expert testimony as a whole." *Id.* 281 P.2d at 713. It held, therefore, that the witness could be asked how often he had performed appraisal work and testified for the State and how much he was being paid for his services in that case, but the court concluded that the question as to how much he had received as an appraiser and witness in prior unrelated cases was irrelevant.

Florida has taken a similar position. In *Syken v. Elkins,* 644 So.2d 539 (Fla.Dist.Ct.App.1994), *aff'd,* 672 So.2d 517 (1996), the court considered certain discovery orders directing a proposed medical expert to produce an array of financial records. In setting out guidelines as to what could be compelled and what could not, the court held that an expert "may be asked to give an approximation of the portion of their professional time or work devoted to service as an expert," but the witness "need not answer how much money he or she

earns as an expert or how much the expert's total annual income is." *Id.* at 546.

As noted, Ms. Wrobleski relies principally on a Pennsylvania case—*Mohn v. Hahnemann Medical College and Hosp.*, 357 Pa.Super. 173, 515 A.2d 920 (1986). *Mohn* followed the decision of the Pennsylvania Supreme Court in *Zamsky v. Public Parking Authority of Pittsburgh*, 378 Pa. 38, 105 A.2d 335 (1954). In *Zamsky,* a condemnation case, the court held that it was error to question the condemning authority's expert witness about fees he had received over a five-year period for services rendered in connection with the acquisition of 39 other pieces of property. The court found it proper to ask an expert witness about fees received for testifying in the instant case but concluded that earnings "from other services performed for the defendant were a purely collateral matter and the testimony thereon was not admissible to affect his credibility." *Id.* 105 A.2d at 336.

In *Mohn,* a medical malpractice case, the defendant complained about an exhibit taken from the financial records of the defendant's medical expert witness showing the total amounts paid to the witness over a five-year period by law firms or agencies. Those figures included far more than payments received for forensic services, however—for rendering reports to lawyers and testifying in court—but included as well payments for routine treatments and consultations. The doctor noted that they included services rendered to a patient who became sick on the job and needed a pacemaker, simply because the bill was paid by a law firm after the patient returned to work following implant surgery. Though approving an inquiry into the extensive relationship between the witness and the defendant's law firm, the court refused to condone "the type of extensive disclosure of an expert's fee generating cases, especially since they were not related to the case at bar (except tangentially) *nor were all of them, to coin a phrase utilized by the parties, 'medico-legal cases.'* " (Emphasis added.) There must be, the court held, "a point beyond which inquiry is/will be held to be prejudicial, too intrusive and only serving to divert the case into collateral matters." *Id.*

515 A.2d at 923. The permissible bounds were exceeded, the court said, "when the expert's total income, unrelated ... to the 'results of the trial,' was exposed to the jury." *Id.* 515 A.2d at 925.

As is evident from more recent Pennsylvania cases, *Mohn* was not intended to preclude all inquiry into an expert witness's income from forensic activity. In *Smith v. Celotex Corp.,* 387 Pa.Super. 340, 564 A.2d 209 (1989), a personal injury action based on exposure to asbestos, the court found no error in permitting the defendant's medical expert witness to be asked about fees generated from testimony for defendants in other asbestos cases. The court contrasted that inquiry, which was relevant to show whether the witness was biased in favor of defendants in asbestos cases, with "the breadth of disclosure disallowed in *Mohn,* where the expert's entire financial picture was displayed to the jury." *Id.* 564 A.2d at 214. See also *Spino v. John S. Tilley Ladder Co.,* 448 Pa.Super. 327, 671 A.2d 726 (1996), *aff'd on other grounds,* 548 Pa. 286, 696 A.2d 1169 (1997) (finding no reversible error in questioning plaintiff's medical expert witness, who was a principal of a forensic consulting company, as to whether he was earning $100,000 a year from that business); *Tiburzio–Kelly v. Montgomery,* 452 Pa.Super. 158, 681 A.2d 757 (1996) (when medical expert witness testified that he turned all fees for forensic activity over to charity, no error in eliciting that that was a recent policy and that in an earlier year, the expert received over $100,000 for his services as an expert).

As we have indicated, two basic principles are fixed as part of Maryland law and the law generally: the scope of cross-examination of expert witnesses is largely within the control and discretion of the trial judge, but wide discretion must be allowed in permitting cross-examination as to bias and interest. The normal and appropriate function of cross-examination into the compensation an expert witness earns, either for services rendered in the case at bar or from forensic activities generally, is to expose bias—any personal interest the witness may have in arriving at the stated opinion. It is

not the function, or at least not the *proper* function, of such cross-examination to embarrass witnesses or to invade unnecessarily their legitimate privacy, and thus to discourage them from testifying and thereby make it more difficult for parties to obtain needed expert testimony.

For the reasons noted above, summarized and applied by the Illinois court in *Trower,* we believe that it is generally appropriate for a party to inquire whether a witness offered as an expert in a particular field earns a significant portion or amount of income from applying that expertise in a forensic setting and is thus in the nature of a "professional witness." If there is a reasonable basis for a conclusion that the witness may be a "professional witness," the party may inquire both into the amount of income earned in the recent past from services as an expert witness and into the approximate portion of the witness's total income derived from such services. The trier of fact may find either or both to be significant in determining the witness's credibility.[5] We hasten to add, however, two important caveats. First, we do not intend by our decision today to authorize the harassment of expert witnesses through a wholesale rummaging of their personal and financial records under the guise of seeking impeachment evidence. The allowance of the permitted inquiry, both at the discovery and trial stages, should be tightly controlled by the trial court and limited to its purpose, and not permitted to expand into an unnecessary exposure of matters and data that are personal to the witness and have no real relevance to the credibility of his or her testimony. Second, the fact that an expert witness devotes a significant amount of

---

5. The relevance of being regarded as a "professional witness" may vary, depending on circumstances. Medical examiners, for example, are expected to testify with respect to their medical findings and opinions, as are State psychiatrists who perform court-ordered competency and responsibility evaluations. The rendering of forensic reports and appearances in court are part of their overall duties and their compensation usually covers those activities. The relevant question is not simply whether the witness frequently appears in court but whether the witness has some personal or financial incentive to produce a particular opinion.

time to forensic activities or earns a significant portion of income from those activities does not mean that the testimony given by the witness is not honest, accurate, and credible. It is simply a factor that is proper for the trier of fact to know about and consider.

JUDGMENT OF COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.