985 A.2d 581

Deborah L. PFEIFER

v.

PHOENIX INSURANCE CO.

No. 01851 Sept. Term 2008.

Court of Special Appeals of Maryland.

Jan. 4, 2010.

676

Mark C. Miller (William J. Blondell on the brief), Baltimore, for appellant.

Rodger O. Robertson (Law Office Joseph Jagielski on the brief), Baltimore, for appellee.

Panel: HOLLANDER, JAMES R. EYLER, and MATRICCIANI, JJ.

MATRICCIANI, J.

Appellant/cross-appellee Deborah L. Pfeifer ("Ms.Pfeifer") appeals the sufficiency of a jury verdict in the Circuit Court for Baltimore County for $100,000 in damages against appellee/cross-appellant Phoenix Insurance Company ("Phoenix")

for breach of contract regarding an underinsured motorist claim. Ms. Pfeifer presents one issue for our consideration, which we have rephrased as such:

> I. Whether the circuit court abused its discretion by permitting Phoenix to present the de bene esse deposition of its expert as evidence after Ms. Pfeifer had been deprived of the opportunity to cross-examine the expert as a result of his failure to comply with a properly issued subpoena duces tecum.

Phoenix's cross-appeal asserts that Ms. Pfeifer's claim is barred by the statute of limitations. We affirm the circuit court's ruling for the reasons explained below.

## FACTS

On February 12, 2003, Ms. Pfeifer was involved in an automobile accident in Baltimore City, Maryland. At the time of the accident, Ms. Pfeifer was operating a vehicle owned by her employer, International Union of Operating Engineers Local 37. Ms. Pfeifer's employer had a contract for automobile liability insurance with Phoenix, which contained a provision for uninsured/underinsured motorist coverage pursuant to Md.Code (1996, 2006 Repl.Vol.), § 19–509 of the Insurance Article ("IA")[1].

On February 27, 2003, Ms. Pfeifer's attorney sent a letter in which he notified Phoenix of ongoing settlement negotiations, asserting that, "even if there is a liability policy, there may be insufficient limits of coverage to pay all of the damages to our client considering the injuries sustained." In October 2004, the tortfeasor's insurance company offered its policy limits of

---

1. § 19–509 states, in pertinent part:

    (c) *Coverage required.*—In addition to any other coverage required by this subtitle, each motor vehicle liability insurance policy issued, sold, or delivered in the State after July 1, 1975, shall contain coverage for damages, subject to the policy limits, that:

    (1) the insured is entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injuries sustained in a motor vehicle accident arising out of the ownership, maintenance, or use of the uninsured motor vehicle[.]

$100,000. Ms. Pfeifer informed Phoenix of that offer and requested permission to accept the settlement on October 13, 2004. With Phoenix's written permission, Ms. Pfeifer accepted the offer of the tortfeasor's insurance company and released all claims against the tortfeasor.

On July 10, 2006, Ms. Pfeifer filed suit against Phoenix for breach of contract arising from Phoenix's failure to pay underinsured motorist benefits. During the discovery phase, Ms. Pfeifer consented to an evaluation by Mark Rosenthal, M.D., a medical expert witness hired by Phoenix. On May 15, 2008, Phoenix noted the de bene esse deposition of Dr. Rosenthal, which was scheduled for July 23, 2008.

Ms. Pfeifer then noted a discovery deposition and issued a subpoena duces tecum requiring Dr. Rosenthal to produce various documents, including documents reflecting how much income he earned from the review of records, testimony at deposition or trial, forensic evidence, independent medical examinations, examinations conducted on any person who was not a patient and research in connection with any forensic assignment. Ms. Pfeifer also requested documents relating to the potential of bias, including agreements with any insurance carrier relating to forensic activities or medical examinations on persons who are not patients and bills for work performed on behalf of appellee and appellee's counsel. Ms. Pfeifer notified Dr. Rosenthal that he would not need to appear for his deposition on July 2, 2008, if all of the documents requested in the subpoena were provided prior to that date.

On June 8, 2008, Ms. Pfeifer received a response from Dr. Rosenthal in which he provided his curriculum vitae and information regarding his examination of Ms. Pfeifer. Ms. Pfeifer wrote a letter confirming receipt of the above documents and requesting the other documents. Dr. Rosenthal's office responded with a letter stating "no further documentation is kept with regard to the list of additional documentation you seek." On July 1, 2008, Phoenix filed a motion for protective order seeking relief from the subpoena.

After Dr. Rosenthal did not appear at the deposition on July 2, Ms. Pfeifer filed an answer to the motion for protective order, as well as a motion to compel discovery and a motion to defer the de bene esse deposition. The court did not rule on these motions prior to trial.

On July 23, 2008, the de bene esse deposition of Dr. Rosenthal was taken. On July 25, 2008, Ms. Pfeifer filed a motion to exclude Dr. Rosenthal from testifying at trial by videotape deposition or trial appearance. On July 28, 2008, trial commenced and the court ruled on the motion to exclude, finding:

> Dr. Rosenthal may testify in this case, provided that in advance of his testimony the information requested is produced, that is Numbers 10 and 12 of the notice to take deposition duces tecum and with respect to his tax return information. Although it was requested for 10 years, a five-year period is appropriate, whatever income he received with respect to 1 through 6 of the subpoena duces tecum.

In response to the court's ruling, Phoenix produced two letters from Dr. Rosenthal's office, stating that they could not locate a record of payments from Phoenix to Dr. Rosenthal. Phoenix also produced a chart showing payments received by Dr. Rosenthal for various services, including legal services and work-related examinations, between 2004 and 2008.

At the circuit court's instruction, Dr. Rosenthal's discovery deposition took place on July 29, 2008. The next day Phoenix presented the de bene esse deposition of Dr. Rosenthal to the jury and Ms. Pfeifer was permitted to read a portion of Dr. Rosenthal's discovery deposition to the jury and to introduce the chart produced by Dr. Rosenthal. Ms. Pfeifer attempted to introduce the entire discovery deposition into evidence but the trial court denied this request.

The trial ended on July 31, 2008, and the jury returned a verdict in favor of Ms. Pfeifer in the amount of $100,000. The verdict was reduced to zero upon motion by Phoenix pursuant

to IA § 19–509(g)[2], due to the $100,000 which had already been received from the tortfeasor. Ms. Pfeifer filed a motion for a new trial or for additur on August 11, 2008, and the court denied this motion on September 9, 2008. Ms. Pfeifer timely appealed.

## DISCUSSION

### I.

Ms. Pfeifer contends that the circuit court abused its discretion by allowing Phoenix to present the de bene esse deposition of Dr. Rosenthal after Ms. Pfeifer had been deprived of the opportunity to cross-examine Dr. Rosenthal with the documents she had requested beforehand. Ms. Pfeifer argues that Dr. Rosenthal failed to comply with a properly issued subpoena duces tecum. Ms. Pfeifer argues that she complied with the Maryland Rules of Procedure in seeking information from Dr. Rosenthal. According to Ms. Pfeifer, the circuit court abused its discretion by failing to provide any meaningful remedy for Phoenix's discovery violations.

We review the circuit court's determination of discovery sanctions under an abuse of discretion standard. *Rodriguez v. Clarke*, 400 Md. 39, 57, 926 A.2d 736 (2007). The scope of cross-examination of expert witnesses is largely within the control and discretion of the trial judge, but wide discretion must be allowed in permitting cross-examination as to bias or interest. *Wrobleski v. de Lara*, 353 Md. 509, 525, 727 A.2d 930 (1999). The normal and appropriate function of cross-examination regarding the compensation an expert witness earns is to expose bias. *Id.*

---

**2.** § 19–509(g) states:

> *Limit of insurer's liability.* The limit of liability for an insurer that provides uninsured motorist coverage under this section is the amount of that coverage less the amount paid to the insured, that exhausts any applicable liability insurance policies, bonds, and securities, on behalf of any person that may be held liable for the bodily injuries or death of the insured.

Both parties cite to *Wrobleski* to support their arguments. In *Wrobleski*, the Court of Appeals considered whether the trial court erred in allowing defense counsel to question one of the plaintiff's medical expert witnesses as to how much money the witness had earned in a single year from testifying as an expert *Id.* at 512, 727 A.2d 930. The plaintiff asserted that allowance of this question was error and attributed the unfavorable jury verdict to the question. *Id.* at 515, 727 A.2d 930. Similarly, in the instant case Ms. Pfeifer argues that had she been able to cross-examine Phoenix's medical expert more fully regarding his bias, the jury would have reached a more favorable verdict.

In *Wrobleski* the Court examined the wide latitude granted to a cross-examiner in exploring a witness's bias:

> Exposure of potential bias based on self-interest is often attempted through cross-examination directed at how much the witness is being paid for his or her services in the case at bar, the frequency with which the witness testifies in similar kinds of cases, whether the witness customarily appears for a particular type of party ..., whether the witness is frequently employed by a particular party or attorney and, if so, how much income the witness derives from that employment, and ... the amount or the percentage of the witness's total income that is derived from lawyer referrals or testimony in lawsuits. Some forms of inquiry seek to uncover a specific and enduring relationship between the witness and the party or attorney, from which a direct bias may be inferred. Others are directed at exposing the more subtle problem of the professional "hired gun," who earns a significant portion of his or her livelihood from testifying and, rather than having a tie to a specific party or attorney, may have a general economic interest in producing favorable results for the employer of the moment.

> \* \* \*

> "That an expert in a particular field may be in effect a 'professional witness' in lawsuits, rather than being more or less exclusively a practitioner whose employment in a law-

suit as a witness is merely incidental to his or her profession, is a matter which is likely to bear on the credibility of that expert, since a significant portion of the expert's livelihood may thus depend on his or her desirability as a favorable and convincing witness, thus possibly leading to a temptation for the witness to color findings and testimony to suit the needs of the proponent party, rather than to evaluate and present the subject matter of the testimony with complete impartiality."

*Id.* at 517–18, 727 A.2d 930 (citation omitted). The Court also noted that effective cross-examination of expert witnesses had become more difficult because of the increased latitude given to experts by the modern rules of evidence. *Id.* at 520, 727 A.2d 930. The Court held:

[W]e believe that it is generally appropriate for a party to inquire whether a witness offered as an expert in a particular field earns a significant portion or amount of income from applying that expertise in a forensic setting and is thus in the nature of a "professional witness." ... [T]he party may inquire both into the amount of income earned in the recent past from services as an expert witness and into the approximate portion of the witness's total income derived from such services.

*Id.* at 526, 727 A.2d 930. The Court ended its analysis with a caveat, warning: "[W]e do not intend by our decision today to authorize the harassment of expert witnesses through a wholesale rummaging of their personal and financial records under the guise of seeking impeachment evidence." *Id.* at 527, 727 A.2d 930.

In *Behler v. Hanlon,* 199 F.R.D. 553 (D.Md.2001), the United States District Court for the District of Maryland considered, citing *Wrobleski,* what an expert witness is required to produce in response to a request for information from the opposing side. In *Behler,* the plaintiff requested tax returns, and documents relating to income earned during the last five years by [the expert witness] from defense attorneys and insurance companies, in connection with per-

forming [independent medical evaluations] and testifying as an expert witness in deposition or at trial ... [P]laintiff sought documents relating to the amount of time [the witness] has spent doing such activities, as well as a list of those cases where he has been retained for such services, and attorneys and insurers on whose behalf he has provided forensic services.

*Id.* at 555. The Court ordered the expert to reveal the following information prior to his deposition:

(1) the percentage of his gross income earned for each of the preceding five years attributable to performing expert witness services on behalf of insurance companies, and/or attorneys defending personal injury cases; (2) a list of cases in which he has performed such services during the last five years ... (3) the name of each insurance company for which [the expert witness] has provided services as an expert witness in personal injury cases, for the preceding ten years.

*Id.* at 562.

Here, the court ordered Phoenix to reveal the following: income received for the previous five years from forensic activities, medical examinations and testimony as an expert witness; a history of all bills for forensic or medical activities on behalf of Phoenix Insurance Company for the past five years; and all records, reports, or documents that were supplied to Dr. Rosenthal in preparation for the case. Unlike *Behler*, the court did not order Dr. Rosenthal to produce documents relating to forensic work done for other insurance carriers. The other major difference between the instant case and *Behler* is the timing of the court's order. In *Behler*, the court ordered that the information be provided prior to the trial while here the court ordered that the information be provided prior to a second deposition that took place during the trial and as a prerequisite to the admission of Phoenix's videotaped de bene esse deposition of Dr. Rosenthal.

We recently addressed a similarly recalcitrant party's failure to comply with a lower court's scheduling order in *Living-*

*stone v. Greater Washington Anesthesiology & Pain Consultants, P. C.,* 187 Md.App. 346, 978 A.2d 852 (2009). In *Livingstone* we were asked to determine the propriety of a sanction for violation of a scheduling order. While stressing the discretionary nature of a decision regarding discovery or scheduling violations, we held:

> [W]e will reverse a decision that is committed to the sound discretion of a trial judge if we are unable to discern from the record that there was an analysis of the relevant facts and circumstances that resulted in the *exercise* of discretion. Thus, the record must reflect that the judge exercised discretion and did not simply apply some predetermined position. The discretion is broad but not boundless. If the judge has discretion, he must use it and the record must show that he used it.

*Id.* at 389, 978 A.2d 852 (emphasis in original) (internal quotations and citations omitted).

The record here clearly shows that the circuit court used discretion in fashioning a remedy to ensure that Ms. Pfeifer could introduce evidence pertaining to Dr. Rosenthal's potential bias. Although the timing was not perfect, Ms. Pfeifer was given the opportunity to take Dr. Rosenthal's deposition and explore his bias prior to the introduction of the videotaped deposition. Ms. Pfeifer used information gleaned from the court-ordered deposition during her case-in-chief and in closing argument in order to cast a negative light on Dr. Rosenthal's testimony. Moreover, the record reflects that the circuit judge offered to make Dr. Rosenthal available as a live witness after the court-ordered documents were produced to appellant, but her counsel did not respond to the offer.

The cases that Ms. Pfeifer cites as evidence that Dr. Rosenthal's testimony should have been excluded are inapposite to the instant case. In *Rodriguez v. Clarke,* 400 Md. 39, 926 A.2d 736 (2007), the Court of Appeals ruled that the trial court did not abuse its discretion when it excluded plaintiff's experts from testifying where the plaintiffs had repeatedly failed to provide discovery regarding their experts' opinions. There

are two significant differences between this case and *Rodriguez*. First, the Court was reviewing the trial court's exclusion of the expert rather than a failure to exclude. This means that the Court owed deference to the trial court's discretionary decision, as we do in this case, even though it resulted in summary judgment for the defendant in *Rodriguez*. The second, and perhaps more significant difference, is that in *Rodriguez* the plaintiffs' evasive tactics were clearly designed to hide the substance of their experts' opinion. Similarly, we held in *Bartholomee v. Casey*, 103 Md.App. 34, 651 A.2d 908 (1994), that the trial court's failure to exclude evidence which was not revealed until the eve of trial was an abuse of discretion. Here, Dr. Rosenthal provided the basis for his opinion more than a month before commencement of the trial, meaning Ms. Pfeifer had sufficient time to cross-examine him regarding this opinion during the videotaped deposition.

■ A sanction excluding a key witness "should be reserved for egregious violations of the court's order, and should be supported by evidence of willful or contemptuous or otherwise opprobrious behavior on the part of the party or counsel." *Maddox v. Stone*, 174 Md.App. 489, 507, 921 A.2d 912 (2007). Because the record shows that the circuit court exercised its discretion by fashioning a remedy for Ms. Pfeifer short of exclusion, we hold that it was not an abuse of discretion for the circuit court to allow the videotaped deposition to be played at trial.

## II.

■ Phoenix cross appeals and claims that Ms. Pfeifer's underinsured motorist claim is barred by the statute of limitations. Phoenix argues that the only issue in dispute is the amount of damages which Ms. Pfeifer was legally entitled to recover as a result of a motor vehicle accident which occurred more than three years prior to the filing of suit. Phoenix argues that Maryland appellate courts have drawn a clear

distinction between the contractual and tort aspects of an underinsured motorist claim.

Ms. Pfeifer contends that her suit is not barred by the statute of limitations. Ms. Pfeifer argues that a claim for underinsured motorist benefits is a contract action and that a breach of contract cannot occur until the insurance company has some obligation to pay benefits. Ms. Pfeifer argues that the obligation to pay benefits can not possibly arise until the exhaustion of the underinsured motorist's policy and that as long as the action is filed within three years after exhaustion the statute of limitations defense is not applicable.

■ Maryland Courts and Judicial Proceedings Code § 5 – 101 states: "A civil action at law shall be filed within three years from the date it accrues[.]" We have previously held that "The legislative polic[ies] underlying statutes of limitation include the encouragement of promptness in instituting actions, the suppression of stale claims ... and most of all, the providing of the elements of fairness to defendants." *Decker v. Fink*, 47 Md.App. 202, 206, 422 A.2d 389 (1980). As a general rule limitations against a right or cause of action begin to run from the date of the alleged wrong, and not from the date the alleged wrong is discovered by the plaintiff. *Killen v. George Washington Cem.*, 231 Md. 337, 343, 190 A.2d 247 (1963). However, the Court of Appeals has addressed the difficulties of determining when the statute of limitations begins to run:

> Much has been written as to when 'limitations' should start to run. Some courts have held the cause of action accrues when the defendant commits his wrong, others when the plaintiff discovers the wrong, and still others have held that it does not acrue (sic) until the maturation of harm. Sometimes the happening of the harm, the knowledge of it and the maturation of the harm are simultaneous. When this occurs the recognition of the accrual of the cause of action is simple, when these elements happen sequentially it can become complex.

*Mattingly v. Hopkins,* 254 Md. 88, 93, 253 A.2d 904 (1969). In *Mattingly* the Court assumed without deciding that damages must have accrued to trigger the running of the statute. *Id.* at 96, 253 A.2d 904.

The limitations issue in the instant case is complex because the happening of the harm and the maturation of the harm happened sequentially rather than simultaneously. Ms. Pfeifer was involved in an accident with an underinsured motorist and two weeks later she sent a letter to the underinsured motorist carrier. In this letter she stated her intention to pursue a claim for uninsured and/or underinsured motorist benefits in the event that the other motorist had insufficient limits of coverage to pay for all of the injuries she sustained as a result of the accident.[3] About a year and a half after the accident, Ms. Pfeifer notified the appellee that the tortfeasor's insurance company had offered its policy limits and Phoenix consented to acceptance of these limits.[4] About three and a half years after the original accident, and about a year and a half after acceptance of the tortfeasor's policy limits, Ms. Pfeifer filed suit in this case. Phoenix contends that the statute began to run from the date of the accident while Ms. Pfeifer argues that the statute could not have begun to run before Phoenix consented to acceptance of the tortfeasor's policy limits.[5]

---

3. The law allows for an insurer to disclaim coverage if the insurer proves that it suffered "actual prejudice" as a result of a delay in providing notice. *General Accident Ins. Co. v. Scott,* 107 Md.App. 603, 614, 669 A.2d 773 (1996).

4. IA § 19–511 establishes the procedure for settlement of claims and requires the injured party to notify his/her carrier of any claim that will exhaust the tortfeasor's coverage limits. The injured party's carrier can accept or reject the offer. If it rejects the offer, it must pay the amount of the settlement offer to the injured person. Once it pays this amount, it retains its subrogation rights against the underinsured motorist insurer.

5. Acceptance of a settlement offer constitutes an admission of the liability of the tortfeasor. *See Maurer v. Pa. Nat'l Mut. Cas. Ins. Co.,* 404 Md. 60, 945 A.2d 629 (2007) (holding that the insurer was not allowed to contest the issues of tort liability in a new trial on the issue of

Both parties cite to *Lane v. Nationwide Mutual Insurance Company,* 321 Md. 165, 582 A.2d 501 (1990), to support their respective positions. In *Lane,* the plaintiffs brought a tort action against the uninsured motorist who had caused the accident and the plaintiff's insurance company was duly notified and decided not to intervene. *Id.* at 167, 582 A.2d 501. While this claim was still pending, the plaintiffs brought a breach of contract action against the insurer, seeking to recover uninsured motorist benefits under their policy. *Id.*

*Lane* is important to our analysis for several reasons, but it is also distinguishable in certain respects. First, the Court of Appeals began its analysis in *Lane* by referencing the Court's prior interpretations of the uninsured motorist statute, where it had found that the statute "embodies a public policy to assure financial compensation to the innocent victims of motor vehicle accidents who are unable to recover from financially irresponsible uninsured motorists." *Id.* at 169, 582 A.2d 501. Prior to *Lane,* the Court had held that "the remedial nature of the statutory plan ... dictates a liberal construction in order to effectuate its purpose of assuring recovery for innocent victims of motor vehicle accidents." *Id.* (citations omitted). In this case, the Court's emphasis on a liberal construction of the uninsured motorist statute contrasts with the policy underlying the statute of limitations, which is to provide fairness to defendants.

Second, *Lane* supports appellant's argument that a claim for uninsured motorist benefits is a contract action. *Id.* at 170, 582 A.2d 501 ("an action by an insured against his own insurance company for uninsured motorist benefits is clearly a contract action and therefore is governed by the principles and procedures applicable to contract actions generally" (internal quotations and citation omitted)). The underlying claim against Phoenix is that it is in breach of contract for failure to pay in excess of the underinsured motorist's policy limits. Because Phoenix admitted the liability of the tortfeasor by

---

damages after it had consented to settlement with the tortfeasor and his insurer).

consenting to settlement, the only issue addressed by the circuit court was the amount of damages attributable to the tortfeasor. There had been no determination prior to the instant case of the exact amount owed to her as a result of the accident because Ms. Pfeifer never instituted a tort action against the tortfeasor, and instead settled with the tortfeasor's policy carrier for its policy limits.

Third, the Court held that "[a]s long as the insured does not demand compensation under his own insurance policy, the uninsured motorist carrier is not called upon to pay under the contract, and, therefore, there can be no breach of contract causing the statute of limitations to begin running." *Id.* at 174, 582 A.2d 501. Ms. Pfeifer correctly asserts that her letter in the immediate aftermath of the accident did not equate to a demand for compensation. Rather, it was an alert to the possibility of future action under the uninsured motorist provision of her own insurance carrier.

The Court's ultimate conclusion in *Lane* was that:

When an insured elects to bring and does bring a timely tort action against the uninsured motorist, having notified his uninsured motorist carrier of the tort action, and when the insured thereafter either during the pendency of the tort action or within a reasonable time after judgment in the tort case makes a claim upon his insurer for uninsured motorist benefits, the statute of limitations does not begin running against the insured until the insurer denies that claim, thereby allegedly breaching the contract.

*Id.* at 177, 582 A.2d 501.

The main reason that *Lane* is distinguishable from the instant case is that here Ms. Pfeifer did not bring a timely tort suit against the underinsured motorist because of her settlement. *See also Keeney v. Allstate Ins. Co.*, 130 Md.App. 396, 406, 746 A.2d 947 (2000) ("[A] first-party contract . . . action against an [uninsured motorist] carrier does not arise—until the insured demands compensation and that demand is rejected. That demand need not be made within three years after the accident. [A]t the . . . insured's option, the insured can

first bring a tort action and, after judgment is rendered in the tort suit, make a demand.") (citation omitted). As the circuit court repeatedly emphasized, here there was no denial by Phoenix because there was no claim by Ms. Pfeifer for Phoenix to deny. The claim for underinsured benefits manifested itself only through Ms. Pfeifer's filing of the instant claim against Phoenix, which came more than three years after the date of the accident.

We must decide, therefore, whether Ms. Pfeifer can institute a contract action against her insurance carrier more than three years after the accident where the goal of her action is to ascertain whether she is owed any money in excess of a prior settlement sum that exhausted the limits of the tortfeasor's policy.

Section 19–509(g) of the Insurance Article of the Maryland Code provides guidance for our inquiry. It states:

*Limit of insurer's liability.* The limit of liability for an insurer that provides uninsured motorist coverage under this section is the amount of that coverage less the amount paid to the insured, that exhausts any applicable liability insurance policies, bonds, and securities, on behalf of any person that may be held liable for the bodily injuries or death of the insured.

Phoenix included a similar provision in its policy with Ms. Pfeifer. We interpreted this provision of the Insurance Code in *Kurtz v. Erie Insurance Exchange,* 157 Md.App. 143, 849 A.2d 1050 (2004), where we held that the provision allows insurers to require complete exhaustion of available benefits before paying underinsured benefits. *Id.* at 151, 849 A.2d 1050. We held that payment of anything less than the full amount of that limit entitles the insured's underinsured motorist carrier to deny the insured's claim for additional benefits. *Id.* at 145, 849 A.2d 1050.

As explained in 4 Corbin on Contracts, §§ 989 (1951):

There is no necessity for making the statutory period of limitation begin to run against the plaintiff until the day fixed by the contract for the rendition of performance ... It

is generally said that he ... may properly wait until the time that performance was due, before regarding the contract as broken. He is not justified in forbearing to take steps that will mitigate his injury; but the defendant ought not to be allowed to complain at the delay in bringing action against him[.]

Here, the day fixed by the contract for rendition of performance could not have been before Ms. Pfeifer, with Phoenix's permission, accepted (or denied) the tortfeasor's offer exhausting the tortfeasor's policy limits. That date was November 18, 2004. Ms. Pfeifer filed suit in this case on July 10, 2006, less than three years from the date when the cause of action could have first accrued and therefore within the limitations period.

■ To recap, when Ms. Pfeifer filed suit on July 10, 2006, she based her claim on the underlying contract between her and Phoenix. Thus, the action against Phoenix is a contract action, and the cause of action would accrue upon breach of the contract, either by anticipatory repudiation or actual breach in performance. *Supra*, p. 689, 985 A.2d at 589–90. Breach of contract in an underinsured motorist context occurs when the carrier denies coverage. *Supra*, p. 690, 985 A.2d at 590–91. That denial, and concomitant breach, can occur when the carrier denies coverage based on a general assertion, distinct from the facts of the claim, that premiums were not paid or that the claimant is not an "insured" under the policy.[6]

---

**6.** Normally, in contract actions, the breach occurs before the damages. What is unusual about a contract action based on underinsured motorist coverage is that some damage occurs **before** the breach. The breach itself does not occur until payment is required and refused or anticipatorily refused. Thus, maturation of harm is not the issue. Payment under the underinsured motorist contract is due once the liability of the tortfeasor is established (by consent, admission by operation of law, or by trial) and damages are established in excess of the amount for which the tortfeasor is liable (by consent, by operation of law based on failure to participate in the negotiated settlement with the tortfeasor when invited, or trial). Therefore, in most underinsured motorist cases, the statute of limitations does not begin to run until damages have been determined to be more than the amount garnered from the tortfeasor's insurer.

Denial of coverage can also occur after there has been a determination as to whether the underinsured motorist is in fact the actual tortfeasor. This determination can occur either by trial or settlement agreement. Once the underinsured motorist carrier consents to settlement with the tortfeasor it can no longer deny coverage, and thereby breach the contract, on this basis.

The final issue, and the one the lower court addressed in this case, is whether the amount recovered from the tortfeasor is sufficient to cover the damages sustained by the underinsured motorist. The underinsured motorist carrier can deny coverage before this amount is determined, or it can wait until after the circuit court determines the exact amount of damages which are attributable to the tortfeasor. In any event, the cause of action can not accrue until there has been a denial of coverage.

As we are not aware of another Maryland decision directly addressing this issue, we look to other jurisdictions to see how they have dealt with the issue. Although other states have differing opinions as to when the statute of limitations should begin to run in an underinsured motorist action, we are most persuaded by those courts that have held that the limitations period begins to run when the insured settles with the tortfeasor and not when the loss occurs. In *American Universal Insurance Company v. DelGreco*, 205 Conn. 178, 196, 530 A.2d 171 (1987), the Connecticut Supreme Court held that "[the legislative history] indicate[s] a legislative intent that underinsured motorist coverage is triggered when the tortfeasor's automobile liability coverage is exhausted." *Contra Arrasmith v. State Farm Ins. Co.*, 24 Cal.App.4th 12, 29 Cal.Rptr.2d 53, 57 (1994) (holding that failure to file suit against the other motorist within the limitations period meant that "subsequent events could not operate retroactively to bring to life a claim which they had never taken steps to protect.") The Supreme Court of Florida has held that "the effect of ... the exhaustion clause was to toll the statute of limitations until the insured settled its claim against the tortfeasor's liability carrier." *Woodall v. Travelers Indem. Co.*, 699 So.2d 1361, 1365

(Fla.1997). The Court in *Woodall* also discussed the unfairness that could result to the injured as a result of a finding that the limitations period ran from the date of the accident, stating:

> [The exhaustion clause] requires a claimant for underinsured motorist benefits to first prosecute a claim against a *third party,* and there is no guarantee that this condition precedent can be successfully satisfied within the limitations period.

\* \* \*

> [I]t is quite a different matter to suggest that an insurer may include a[n] [exhaustion] provision in its policy and later claim that the insured cannot rely on the terms of that provision because the provision was invalid. Travellers cannot disavow the provisions of its own policy.

*Id.* at 1364, 1365.

We are satisfied that our ruling today does not go against the legislative policy underpinning the statute of limitations and that it also advances the policy behind the statutory requirement that carriers provide underinsured motorist coverage. Insurers are still protected from the danger of unfair surprise by the fact that the insured party is required to give timely notice of the possibility of a claim for uninsured motorist coverage. *See General Accident Ins. Co. v. Scott, supra,* 107 Md.App. at 613, 669 A.2d 773. Insurers are also protected by the fact that injured parties ordinarily will do one of two things within the three-year limitations period: (1) settle for the policy limits of the tortfeasor's coverage; or (2) commence a tort action to ascertain how much they are owed. Given the fact that the insured party is required to give notice of a potential claim shortly after the accident, this alleviates any concern about stale claims, loss of evidence, or manipulation of the statutory scheme.

Therefore, we hold that the statute of limitations in an underinsured motorist contract action for damages does not begin to run until, at the earliest, the date on which

exhaustion of the tortfeasor's coverage occurs.[7]  A breach of contract, triggering the statute of limitations, can only occur after the underinsured motorist carrier denies further coverage.  Our holding is not meant to address denials of coverage that occur prior to exhaustion.  We are confident that this decision ensures recovery for innocent victims of motor vehicle accidents and thus is in line with the remedial nature of the statutory plan requiring underinsured motor coverage.  It is our intention that by holding as we do today we will prevent a situation whereby a victim of a motor vehicle accident will be denied underinsured motorist coverage because of circumstances beyond his/her control, such as where complete exhaustion of the tortfeasor's coverage limits is not obtained within three years of the accident due to no fault of the insured.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED.**

**COSTS TO BE PAID 50% BY APPELLANT AND 50% BY APPELLEE.**

---

7.  Logically, if the tortfeasor is uninsured the cause of action can not accrue before a determination of liability in the tort case.  *See Lane v. Nationwide Mutual Insurance Company, supra,* 321 Md. at 177, 582 A.2d 501.